UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE COALITION TO PROTEST THE DEMOCRATIC NATIONAL CONVENTION, et al.<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF BOSTON, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION<br>)  NO.<br>)  04-11608 DPW<br>)<br>)<br>) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

The plaintiffs are political activists seeking to demonstrate their opposition to the platform of the Democratic Party through a symbolic march to the site of the Democratic National Convention ("DNC"). To do this, they have planned to hold a rally on the Boston Common and to march from there to the Fleet Center, passing along a stretch of Causeway Street ("Causeway"), the only street open to the public that fronts the DNC site, and then returning to the Common. The route has been chosen by the plaintiffs for the express purpose of creating a visible symbol of protest at the DNC's doorstep. Although Causeway will be closed to cars and will be freely accessible to the general public -- including demonstrators -- the defendants rejected the plaintiffs' parade application. Instead, the defendants approved a parade route without justification and in violation of the First and Fourteenth Amendments of the United States Constitution.

The approved route does not pass Constitutional muster. First, the defendants' proposal is not narrowly tailored to serve a significant government interest. The only justifications the defendants offer are demonstrably hollow, and therefore constitutionally deficient. *See Jews for Jesus, Inc. v. Massachusetts Bay Transp. Auth'y*, 984 F.2d 1319 (1st Cir. 1993). Moreover, the defendants' proposed parade route does not leave open ample alternative means of

communication. Indeed, by relegating the plaintiffs to isolated side streets away from the DNC, the defendants have not only prevented the plaintiffs' message from reaching the DNC, they have fundamentally altered the message. *See United States v. Baugh*, 187 F.3d 1037, 1044 (9th Cir. 1999) ("An alternative is not ample if the speaker is not permitted to reach the intended audience.")

The defendants' decision to ban the plaintiffs from Causeway does not comport with the requirements of the First Amendment. The plaintiffs respectfully ask the Court to enter an injunction ordering the defendants to issue a permit for the Causeway parade.

## FACTS

The Coalition to Protest the Democratic National Convention ("the Coalition) is the umbrella organization under which the plaintiffs have united to deliver a poignant message of protest against "the unjust, racist, and imperialist policies and platform of the Democratic Party and the DNC." Affidavit of Steve Kirschbaum ("Kirschbaum Aff. ¶ 5). Although they are a diverse group of political organizations and causes, they are united in this message. *Id.* ¶ 15. Their unity symbolizes the breadth and politically relevance of their constituency. *Id.* The raw symbolism of their proposed Causeway parade is essential to their message that they cannot be silenced and will not be ignored. *Id.*

With this message in mind, on June 11, 2004, the principal organizers of the Coalition, plaintiff Act Now to Stop War and End Racism - Boston ("ANSWER Boston") applied for a permit to hold an event on Sunday July 25, 2004. The kick-off event begins with a rally on the Boston Common, one of the City's most visible symbols of the people's power. *Id.* ¶ 7. The rally was to be followed by a 2:00 p.m. parade from the Common to the DNC, one of the most visible symbols of the seat of power of the Democratic Party. *Id.* The proposed route includes a leg along Causeway directly in front of the Fleet Center, before circling back to return to the Common. *Id.* The organizers estimate the event will attract approximately 2000 people. *Id.* ¶ 8.

The plaintiffs applied separately for rallies and parades during July 26-29. *Id.* ¶ 6. The rallies on those dates are to take place at Faneuil Hall and Government Center. *Id.* ¶ 7.

Accordingly, the parade routes are slightly, but each includes the critical Causeway leg. *Id.* The parades on those dates are anticipated to begin between 6:00 p.m. and 7:00 p.m. *Id.* ¶ 7. The organizers expect considerably fewer people to attend these mid-week parades than the kick-off parade on Sunday. *Id.* ¶ 8.

Within a few days, OCAL notified ANSWER Boston that the application for the rallies had been conditionally approved, but the request for a parade route had been denied. *Id.* ¶ 9.

On or about June 24, 2004, Coalition representatives (including ANSWER Boston, USWA Local 8751, the Women's Fightback Network, the International Action Center, Councilor Turner's office, and others) met with representatives of the Boston Police Department, OCAL, and the Transportation Department to discuss the City's denial of the parade permit. *Id.* ¶ 10. The City confirmed that it would not approve the Coalition's request, but undertook to provide an alternative parade route. *Id.* ¶ 11.

True to its word, two weeks later the City sent the Coalition a parade permit. *Id.* ¶ 12. Unfortunately, the City-approved route omits Causeway altogether. *Id.* ¶ 13. Instead, it zigs and zags through the side streets and alleys of the so-called "Soft Zone" neighborhood to the south of the Fleet Center, well out of range and out of sight of Causeway, the Fleet Center, and the DNC. *Id.*

The City-approved route deposits the Coalition marchers in an enclosed "protest pen" on Haverhill Street, which is set back a considerable distance from Causeway. *Id.* This is accomplished by shunting the parade down Rip Valenti Way, an alley that is roughly twenty feet wide. *Id.*, and Affidavit of Carol Rose ("Rose Aff.") ¶ 11. This entrance passes beneath an overhead roadway, with vertical clearance of barely six feet. Rose Aff. ¶ 11. The Zone is enclosed by fences wrapped in semi-opaque, plastic archery netting. *Id.* The City-approved route requires the parade to double back on itself inside the Zone and exit through the Rip Valenti passageway. Kirschbaum Aff. ¶ 12 and Exhibit C thereto.

Meanwhile, during the DNC, Causeway will be open to the general pedestrian public. Rose Aff. ¶ 9. Half of Causeway Street will be built up as a sidewalk for a pedestrian walking

LTDOCS/560993.1

zone. *Id.* Motorized traffic will be prohibited. *Id.* Members of the public are free to process down Causeway, directly in front of the Fleet Center, whether their purpose is to engage in political speech or simply to stroll. *Id.* Causeway is not being controlled by the Secret Service but rather remains under the jurisdiction of the City, and the City has the final say over what activity is allowed there. *Id.* ¶ 10.

The City proffers two purported justifications for denying plaintiffs' request to march on Causeway. First, the City fears that the bars on Causeway might lose some business due to the passage of a parade and might later sue the City. *Id.* ¶ 7. Second, the City predictably raises the specter of public safety concerns should an emergency require an evacuation of Causeway during the parade. *Id.* ¶ 8.

For the reasons discussed below, these concerns are plainly hollow, and do not satisfy the City's heavy burden to overcome the presumed unconstitutionality of the restraints they have imposed on the plaintiffs' speech. The City has intentionally deprived the plaintiffs of the opportunity to get anywhere near Causeway and the DNC. Moreover, the approved parade route not only drowns out the plaintiffs' intended message, it fundamentally alters the message by proving that the system can and will relegate them to the margin of the political debate.

### Argument

A preliminary injunction will issue upon a showing that: "(1) plaintiff will suffer irreparable injury if the injunction is not granted; (2) such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) plaintiff has exhibited a likelihood of success on the merits; and (4) the public interest will not be adversely affected by the granting of the injunction." *Camel Hair & Cashmere Inst. v. Associated Dry Goods Corp.,* 799 F.2d 6, 12 (1st Cir. 1986).

There is no serious dispute that the plaintiffs satisfy the first, second, fourth elements of this test. Concerning the plaintiffs likelihood of success, because the defendants bear the burden of establishing the lawfulness of their actions, the plaintiffs show a likelihood of success on the merits by "establishing facts that would create a high probability that the government cannot

meet its burden on one or both prongs of the applicable test." *Service Employee Int'l Union v. City of Los Angeles*, 114 F. Supp. 2d 966 (C.D. Cal. 2000). The plaintiffs readily satisfy this element as well.

A. The Plaintiffs Will Suffer Irreparable Harm if the Requested Preliminary Injunction is Not Granted.

The deprivation of First Amendment rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (infringement of rights of free assembly and free speech constitutes irreparable harm). *See also, LeMay v. DuBois*, 1196 WL 463680 (D. Mass.) (free exercise violation causes irreparable harm). As explained below in Section D., the defendants' refusal to permit the plaintiffs to march on Causeway unlawfully deprives the plaintiffs of their First Amendment rights. If the requested preliminary injunction is not granted, the deprivation of the plaintiffs' First Amendment rights "unquestionably constitutes irreparable harm." *See Burns*, 427 U.S. at 373.

B. The Balance of Harm Weighs Heavily in the Plaintiffs' Favor.

If the Court grants the requested injunction, the City will be required to do no more than meet its Constitutional obligations. By contrast, if the injunction does not issue, the plaintiffs will be constrained to follow the City's parade route. The essence of the plaintiffs' message will not only be lost, it will be altered beyond recognition, in violation of their First Amendment rights. The balance of harm heavily favors the plaintiffs.

C. The Public Interest Will Not Be Adversely Affected.

Similarly, the public interest cannot be adversely affected by an injunction that requires the City to respect the dictates of the First Amendment. Indeed, the "First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *South Boston Allied War Veterans Council v. City of Boston*, 297 F. Supp. 2d 388, 391 (D. Mass. 2003), *quoting Boos v. Barry*, 485 U.S. 312, 318 (1988). Surely, an injunction ordering the defendants to respect this "profound national principle" is very much in the public interest.

D.   The Plaintiffs are Likely to Succeed on the Merits.

The plaintiffs are likely to succeed on the merits of their claim because the defendants cannot meet their burden to show that banning the plaintiffs from Causeway is a reasonable time, place or manner restriction. The defendants' purported justifications are not credible, and are therefore deficient. Moreover, because the symbolic, expressive value of the plaintiffs proposed parade route is completely lost if the plaintiffs are relegated to the back-street route proposed by the defendants, that route is not an ample alternative means of communication. Banning the plaintiffs from Causeway -- which is otherwise open to the public for protests and demonstrations -- violates the plaintiffs' First Amendment rights.

The fundamental principles establishing plaintiffs' likelihood of success are familiar and well-established. Public streets have always been "'held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *The Nationalist Movement v. City of Boston*, 12 F. Supp. 2d 182, 190 (D. Mass. 1998), (quoting *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515 (1939) (Opinion of Roberts, J.)). Such use of public fora has, "from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.'" *Id.* Public "streets are proper places for the dissemination of information and opinion[,] and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Nationalist Movement*, 12 F. Supp. 2d at 190, *quoting Schneider v. State of New Jersey*, 308 U.S. 147 (1939). Any system of prior restraints on speech in such places faces a heavy presumption against its constitutional validity, and is subject to the highest constitutional scrutiny. *Vance v. Universal Amusement Co., Inc.*, 445 U.S. 208 (1980).

In a public forum such as Causeway, "the government's ability to permissibly restrict expressive conduct is very limited: [It] may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Lederman v. United States*, 291 F.3d 36, 44 (D.C. Cir. 2003) (quoting *United States v. Grace*,

461 U.S. 171, 177 (1983)). "The Government bears the burden of proving that the 'narrowly tailored' and 'alternative communication' prongs are satisfied." *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1227 (9th Cir. 1990). The defendants cannot satisfy this burden.

      1.    The Defendants' rejection of the Plaintiffs' Causeway parade is not narrowly tailored to serve a significant government interest.

The City's decision to ban the plaintiffs from Causeway is not narrowly tailored to serve a significant government interest. The Court's review of this issue focuses on two inquiries: "'whether [the City's] interest is sufficiently substantial to justify the effect of the [restriction] on [plaintiffs'] expression, and whether that effect is no greater than necessary to accomplish the [City's] purpose.'" *Jews for Jesus, Inc., v. Massachusetts Bay Transportation Authority*, 984 F.2d 1319, 1323 (1st Cir. 1993) (citation omitted). The crux of a time, place or manner analysis is "'whether the manner of [banned] expression is basically incompatible with the normal activity of a particular place at a particular time.'" *Id.* at 1325 (quoting *Grayned v. Rockford*, 408 U.S. 104, 116 (1972)). The lack of a credible explanation and evidence to support a restriction on speech "compels its invalidation." *Id.* at 1326 (rejecting MBTA's proffered explanation as not credible and finding violation of plaintiff's free speech rights); *Nationalist Movement*, 12 F. Supp. 2d at 191 ("hollow" explanations for restrictions on parade were insufficient to meet city's obligations under the First Amendment).

In *Jews for Jesus*, the MBTA argued that its leafleting ban was justified by public safety concerns because, inter alia, discarded leaflets cause accidents and fires. 984 F.2d at 1324. The First Circuit rejected the MBTA's explanation. The evidence showed that the MBTA permitted myriad other activities that presented the same risks, including passengers with paper and food items, newspaper vendors, and businesses' promotional flyers. *Id.* at 1325. The court concluded that "[t]he MBTA deliberately has invited into the subway system a range of expressive activities that can produce problems similar to those it attributes to leafleting. The condoned presence of these activities indicates that the subway system can accommodate peaceful leafleting." *Id.*

Similarly, in *Nationalist Movement v. City of Boston*, the court found that the City's proffered reasons for restricting the plaintiffs' speech were hollow and concluded that the restrictions at issue violated the First Amendment. 12 F. Supp. 2d 182. There, the City had imposed significant restrictions on the plaintiff's ability to march, ostensibly on grounds that the parade route was through a business district "subject to great traffic congestion and commercial activity." *Id.* at 190-91. Rejecting the City's contention, the court noted that the City routinely grants "permits for parades to be held at midday Saturday on normally congested streets in areas of 'business or mercantile character.'" *Id.* at 191. Specifically, the court noted that the City had issued a permit for the Gay/Lesbian Pride Parade, which was "a Saturday parade predicted to involve upwards of 100,000 participants in the Back Bay and South End." *Id.* The court concluded that the City's rationale was baseless. *Id.*

      a.    The defendants' purported concern for Causeway bars is hollow.

Likewise here, the alleged concerns cited by the defendants in support of their decision to ban the plaintiffs from Causeway are demonstrably hollow. The main Coalition parade is expected to attract only 2,000 people. Kirschbaum Aff. ¶ 8. It is scheduled to take place early in the afternoon on a Sunday. *Id.* ¶ 7. The weekday parades begin at 6 p.m. and are expected to be substantially smaller than the Sunday kick-off. *Id.* ¶¶ 7-8. The fact that the City grants permits for massive parades through busy commercial zones during busy commercial times, *see Nationalist Movement*, 12 F.Supp. 2d at 191, guts the defendants' purported concerns for the bars on Causeway[1]. As in *Jews for Jesus*, the defendants here permit in other contexts a range of expressive activity that can produce the same problems they cite here. 984 F.2d at 1325.

Moreover, the City concedes that Causeway will be closed to motor vehicles. Rose Aff. ¶ 9. There are no traffic concerns. The street is being converted into a giant sidewalk that is open to the public, including for ad hoc, spontaneous protests. *Id.* The only restriction appears

---

[1] As an aside, it is difficult to see how a parade of 2,000 people processing past a series of drinking establishments on a hot summer day can be expected to be bad for business.

to be a ban on *organized* parades. In view of the fact that the City routinely allows vastly larger parades through commercial areas, and the fact that Causeway is being converted into a pedestrian zone open to protesters and demonstrators, the City cannot credibly contend that the plaintiffs' proposed parade "is basically incompatible with the normal activity" on Causeway. *See Jews for Jesus*, 984 F.2d at 1325 (citation omitted).

          b.      The defendants' purported public safety concern are also hollow.

The defendants' public safety concerns fare no better. The defendants claim to fear that, in the event of an emergency, they would be unable to evacuate Causeway during the Coalition parade. This rationale ignores the fact that the City-approved route forces the entire parade down side streets and alleys and *into an enclosed pen*. Rose Aff. ¶ 11. The entrance to the pen is twenty feet wide (the same as the Causeway sidewalk), and six feet high. *Id.* Once inside the pen, the City's proposal requires the parade to double back on itself to exit through the same passageway. Kirschbaum Aff. ¶ 12 and Exhibit C thereto. To suggest that funneling the parade into the pen creates less of an evacuation concern than allowing it to proceed in an orderly fashion along Causeway is simply not credible. *See Jews for Jesus*, 984 F.2d at 1325; *Nationalist Movement*, 12 F. Supp. 2d at 190-91.

Moreover, the defendants' purported safety concerns are based purely on speculation that an emergency necessitating evacuation *might* occur. This is not an adequate justification for restraining speech. *See Service Employee International Union v. City of Los Angeles*, 114 F. Supp. 2d 966 (C.D. Cal. 2000). Although the defendants "need not show 'an actual terrorist attack or serious accident' to meet [their] burden, [they are] not free to foreclose expressive activity in public areas on mere speculation about danger. . . . Otherwise, the government's restriction of first amendment expression in public areas would become essentially unreviewable." *Bay Area Peace Navy*, 914 F.2d at 1228. The defendants speculative concern about possible danger is insufficient to support their decision to ban the defendants from Causeway.

In short, the defendants' purported reasons for banning the plaintiffs from delivering their message on Causeway are not credible and do not withstand scrutiny. The defendants cannot meet their burden to show that banning the plaintiffs from Causeway is narrowly tailored to serve significant government interests. *See Jews for Jesus*, 984 F.2d at 1325; *Nationalist Movement*, 12 F. Supp. 2d at 190-91; *Bay Area Peace Navy*, 914 F.2d at 1228.

2.  The City has not left open ample alternative channels for communication.

"The First Amendment protects the right of every citizen to reach the minds of willing listeners and to do so there must be opportunity to win their attention." *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981). To effectuate this fundamental principle in the time, place, or manner context, the courts recognize that "[a]n alternative is not ample if the speaker is not permitted to reach the intended audience." *U.S. v. Baugh*, 187 F.3d 1037, 1044 (9th Cir. 1999); *see also Service Employee Int'l Union*, 114 F. Supp. 2d at 972.

Parades occupy a special place in our First Amendment tradition. "Parades are public dramas of social relations, and in them performers define who can be a social actor and what subjects and ideas are available for communication and consideration." *Hurley v. Irish-American Gay, Lesbian And Bisexual Group of Boston*, 515 U.S. 557, 568 (1995) (citation omitted). The word "parade" connotes "marchers who are making some sort of collective point, not just to each other but to bystanders along the way." *Id.* Indeed, the expressive value of a parade depends on the ability to attract viewers -- "if a parade or demonstration receives no media coverage, it may as well not have happened." *Id.* Thus, "the inherent expressiveness of marching to make a point" is an established component of First Amendment jurisprudence. *Id.* The "[s]ymbolism [of parades] is a primitive, but effective way of communicating ideas." *Id.* (citation omitted). Moreover, and of special importance here, the Supreme Court recognizes that "the specific place where a message is communicated may be important to the message and, consequently, of constitutional significance itself." *Nationalist Movement*, 12 F. Supp. 2d. at

192 (citing *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994)). Indeed, the location may "be essential to communicating with the intended audience." *Id.*

Here, the City-approved parade route does not provide ample alternative means for communication. On the contrary, it (i) effectively ensures that the plaintiffs have no means of communicating one of the most important elements of their message, and (ii) fundamentally alters the plaintiffs' message. Marching along Causeway, in front of the Fleet Center and the DNC, is an essential component of the plaintiffs' message.[2] Kirschbaum Aff. ¶¶ 15-16. Although the Coalition members represent diverse constituencies, they are marching as a group in order to send a very specific message to the power structure. *Id.* The point of the parade is to come face to face with DNC officials, delegates and onlookers, indeed with the DNC itself, and announce loudly and clearly the plaintiffs' opposition to the Democratic Party platform and their refusal to be marginalized. *Id.* The very act of processing as a body of 2,000 likeminded protesters, right in the front yard of the seat of power of the Democratic party, is an essential component of the message, and indeed is the only way of communicating the message. *See Nationalist Movement*, 12 F.Supp. 2d at 192 (recognizing that for the plaintiffs, the very act of marching on part of the same route traditionally reserved for the St. Patrick's Day parade held expressive value in and of itself).

The City's proposed alternative route obliterates the message. Rather than marching on the street (which is open to the public) that fronts the primary target of their message, where news media are certain to congregate,[3] the Coalition will wander the darkened side streets of the

---

[2] The plaintiffs' chosen route is particularly significant in view of the absence of meaningful alternatives for the plaintiffs to convey their message of protest to the Convention delegates themselves. The security arrangements devised by the Boston Police Department and the Democratic Party have effectively insulated the delegates from any contact with the public in the area of the Fleet Center. The majority of delegates will be brought to the site of the convention by bus, and will disembark from the buses inside a secure area which will be separated from the public by an eight-foot high fence covered with semi-opaque "archery netting." From there, they will proceed through an array of metal detectors into the secure area surrounding the Fleet Center, which has been designated the "hard zone." This area is separated from the public by a wall of "jersey barriers" topped by an eight-foot fence covered with opaque material.

[3] The plaintiffs' freely admit that the news media presence certain to exist on Causeway is a powerful aspect of the symbolic value of their proposed parade. *See Hurley*, 515 U.S. at 568.

Soft-Zone. Rather than ending up at the DNC, the destination is a penned-in "Demonstration Zone" separated from the DNC by considerable physical distance, fences, and semi-opaque plastic barriers. Kirschbaum Aff. ¶ 13; Rose Aff. ¶ 11.

It is bad enough that the City's proposed route prevents the plaintiffs' from delivering their message. It is even worse that, given the nature of the intended message and the proposed alternative "solution," the City's route fundamentally alters the message. Kirschbaum Aff. ¶ 17. Being relegated to back alleys and a penned-in demonstration zone sends the unambiguous message that the plaintiffs are powerless to avoid the sidelines, powerless to engage face to face with the traditional power structure and win the staring contest. *Id.* It demonstrates that the system can and will marginalize the plaintiffs. *Id.*

Such Government attempts "to force the group to change the place and manner of expression may be inseparable from an attempt to regulate the content of the expression itself. When that is the case, as it was here, only the most imminent likelihood of serious danger -- a likelihood that is clear and present -- will justify governmental action to prevent or alter the expression." *Nationalist Movement*, 12 F. Supp. 2d at 192. As discussed above, no such clear and present danger exists here.

## CONCLUSION

The Defendants have offered up hollow reasons for their refusal to permit the plaintiffs to march on Causeway. The lack of a credible explanation for the refusal, and the de facto alteration of the plaintiffs' message by diverting them to side streets in order to avoid unseemly political protest, conclusively establish the constitutional infirmity of the defendants' actions. They cannot meet their burden to show that banning the plaintiffs from Causeway is narrowly tailored to meet a significant government interest and leaves open ample alternative means of communication. Without a valid justification, the defendants are compromising the plaintiffs' ability to participate meaningfully in the political process. The First Amendment demands more.

LITDOCS/560993.1

WHEREFORE, The plaintiffs respectfully request that the Court enter an injunction order the Defendants to approve the Coalition's proposed parade route on Causeway Street.

Respectfully submitted,

THE COALITION TO PROTEST THE DEMOCRATIC NATIONAL CONVENTION, ET AL.

By their attorneys,

Joseph L. Kociubes, BBO # 276360
Neil G. McGaraghan, BBO # 649704
BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

John Reinstein, BBO # 416120
AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS
99 Chauncy Street
Boston, Massachusetts 02111
(617) 482-3170

John McK. Pavlos, BBO # 641113
PAVLOS & VITALI
142 Main Street
Suite 406
Brockton, Massachusetts 02301
(508) 894-0050

Jonathan Shapiro  BBO # 454220
Jeffrey Feuer BBO # 546368
National Lawyers Guild, Massachusetts Chapter
14 Beacon Street
Boston, Massachusetts 02108
(617) 227-7335

Dated: July 11, 2004

LITDOCS/560993.1

-14-

## CERTIFICATE OF SERVICE

I hereby certify that on the 19 Day of July, 2004, I caused a true copy of the above document to be served by hand upon the appropriate agent of the city responsible for receiving service of process.

_____
Neil McGaraghan

LITDOCS/560993.1