UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11608-DPW

COALITION TO PROTEST THE )
DEMOCRATIC NATIONAL CONVENTION, )
ET AL., )
          Plaintiffs )
          v. )
THE CITY OF BOSTON, ET AL., )
          Defendants )

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR OPPOSITION TO THE PLAINTIFFS' REQUEST
FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

The 2004 Democratic National Convention is scheduled to begin on Monday morning, July 26 at the FleetCenter, located on Causeway Street in Boston. The City of Boston has created a secure zone surrounding the FleetCenter, which includes the erection on Causeway Street of a dense mesh metal fence covered by an opaque fabric scrim. This fence cannot be seen through, and the plaintiffs do not challenge the use of this fence or the fabric covering. The fence will be placed immediately next to the curbing on Causeway Street. No travel lane will be left open on Causeway, outside the fence line. The sidewalk on Causeway will be open to the public during the week of the

convention. The only restriction placed on the sidewalk on Causeway is a ban on organized marches.

Plaintiffs' suit seeks to have the Court order the City of Boston (hereafter, "City" or "defendants") issue a permit that would allow plaintiffs and their march attendees (estimated by plaintiffs to number approximately 2000 people) to march down the sidewalk on Causeway. This space measures twenty (20) feet from building edge to the secure perimeter fence. The defendants have denied the permit, on the grounds that the space does not afford sufficient capacity to safely accommodate organized parades and that large marches will block the flow of pedestrian traffic on the sidewalk.

The City has provided a demonstration area in an area adjacent to the FleetCenter, at a location that civil liberties groups requested. This demonstration area is immediately beside the bus terminal where delegates will be dropped off and picked up. Thus, the demonstrators have access to the location where virtually every delegate will pass through. The demonstration area affords the plaintiffs full, unimpeded sight and sound to the delegates arriving for the convention.

The Court should deny this motion, as the City has in every respect afforded the plaintiffs their rights under the First Amendment, and as plaintiffs cannot meet any of the standards required for issuance of a preliminary injunction.

## FACTS

Because the plaintiffs have failed to adequately or accurately describe the physical setting of the Democratic National Convention and its immediate surroundings, the City offers the following facts:

A.   **The Hard Zone**

2

As part of its preparation for hosting the 2004 Democratic National Convention, the City of Boston Police Department conferred with other federal, state and local law enforcement agencies, including the United States Secret Service ("USSS"), beginning as early as November, 2002 (Ex. A, Affidavit of Robert Dunford) to establish a security plan for the FleetCenter, the site of the event.

The FleetCenter itself and space immediately surrounding it have been designated a "hard" zone, into which no persons will be permitted unless they are previously credentialed by the USSS and then, only after they pass through a magnetometer ( or "mag") search. (Ex. A)  The perimeter of the hard zone is to be established by the placement of a security fence, scheduled to be erected on Friday, July 23rd. (Id.) This fence is a tightly woven metal mesh, such that one cannot climb or grasp the fence to pull it over, and will be covered by a fabric scrim that is totally visually impenetrable – one cannot see through this scrim into the interior of the hard zone. (Id.) One standing on the Causeway Street sidewalk will not be able to see the FleetCenter or any of the people in the hard zone.

The fence will be placed against the curbing on the south side of Causeway, such that all lanes of travel on the street will be enclosed within the hard zone. (Ex. A, Ex. B, Affidavit of Scott Sheafe).  The sidewalk, which has been built out twenty feet from building edge to curb, is the only space on the surface of Causeway that is outside the hard zone. (Ex. A, DPW?)

The fence has been placed in this location so that inside the hard zone, there is sufficient space to allow evacuation of the FleetCenter and ingress of emergency

3

equipment (particularly fire trucks), and to allow sufficient "stand-off" space in the event of an explosion. (Ex. B)

**B.     The Soft Zone**

The property known as the "Bulfinch Triangle" has been designated a soft zone – that is, an area closed to vehicular traffic but completely open to pedestrians. (Ex. A). The soft zone is bounded by Causeway Street to Merrimac Street, to New Chardon/Haymarket Square, to North Washington, to Medford Street, to Causeway Street. (Ex. C, map of the area). The BPD is placing heavy vehicles on the roadways (that can be moved to allow access to emergency vehicles if necessary) and erecting a chain-link fence around the perimeter of the soft zone to ensure that no vehicles are able to get past the truck roadblocks by driving onto the sidewalks. (Ex. A). The fencing may also be used to temporarily keep persons from entering the soft zone if an emergency situation erupts or if, in the opinion of public safety personnel, the soft zone is filled beyond capacity. (Ex. A, Ex. D, affidavit of Bernard O'Rourke).

No pedestrian will be denied access to the soft zone, including the sidewalk on Causeway. (Ex. A). The BPD is not instituting random searches of any person seeking to enter the soft zone. (Ex. A). Within the soft zone, there are a number of businesses and licensed premises that will remain open during the week of the convention. (Ex. A, Ex. D) Delegates will be able to leave the hard zone by sally ports (one-way exit points cut into the security fence, located at Portland and Canal Streets ) and may walk freely through the soft zone, if they so desire. (Ex. A).

A number of businesses, including coffee shops, ATMs, restaurants and licensed premises are located along Causeway in the soft zone. (Ex. A, Ex. D)  Many of these

4

establishments are fronted with plate glass windows overlooking the sidewalk. (Ex. A, Ex. D) The twenty foot sidewalk on Causeway also contains permanent structures that further limit the available space: street lamps, stanchions supporting the elevated MBTA train tracks, fire hydrants, and electricity/utility boxes. (Ex. A). As previously described, the fencing along Causeway cannot be seen through. There is no sight access to the FleetCenter or its immediate surroundings from the soft zone side of Causeway. (Ex. A)

C.   **The Demonstration Area**

Inside the soft zone, and located just off Canal Street, the BPD has created a demonstration area. (Ex. E, map of demonstration area). The demonstration area is located immediately adjacent to the property where the Democratic National Convention Committee (hereafter, "DNCC") has created a bus terminal. (Ex. E). Virtually every delegate attending the DNC will arrive at the bus terminal, and virtually everyone entering the hard zone will do so via the bus terminal. (Ex. A)

The demonstration area has two ingress/egress points: one off Canal Street, and one at the southern-most point of the demonstration area, onto Rip Valenti Way. Persons seeking to enter or to leave the demonstration area may do so from either point, although the City is endeavoring to bring large marches in via the Canal Street point as it is more commodious than that at the Rip Valenti Way site. (Ex. A)

The demonstration area will be set off from the bus terminal by a fence: two sets of four (4) foot jersey barrier topped with eight (8) foot chain link fence. The fence is standard chain link and is see-through. A transparent plastic scrim will be hung on the outermost fence (the side facing the bus terminal) and is itself also see through. (Ex. A) This scrim acts as a "splatter shield" to prevent anyone in the demonstration area from

5

spraying any liquids at the delegates as they disembark and move into the hard zone. The fence will also have open weave netting strung from the top of the fence to the steel beams of the elevated MBTA tracks that rise above the demonstration area. The netting is placed in order to prevent anyone from throwing objects over the fence at the demonstrators. (Ex. A)

The demonstration area is approximately 28,000 square feet, and can accommodate approximately 4,000 persons. (Ex. A, Ex. E) Inside the demonstration area, the City is providing a stage (that can hold approximately 10 – 12 people) and a sound system. (Ex. A) The City has established a permit process for access to the stage and sound system. The City is deploying superior officers at the demonstration area in order to assure that all those who have permits to use the stage and sound have unimpeded access to that equipment at the designated times. (Ex. A)

The City is prohibiting anyone from bringing weapons into the demonstration area and has disallowed tables, as they could be used offensively if disorder were to erupt. No other restrictions are being imposed on persons seeking to enter the demonstration area. The BPD will not conduct random searches. No person will be prohibited from entering the demonstration area unless that person is carrying a weapon (or unless reasonable suspicion exists to suggest same). (Ex. A)

The demonstration area is not a "pen," although it is fenced so that the delegates will not be disembarking from busses directly into demonstrations. No demonstrator will have physical access to the delegates at the demonstration area – but no demonstrator will be forced into the demonstration area. There is no "no protest" area in the City itself, aside from the hard zone immediately surrounding the FleetCenter. (Ex. A) Any person,

6

including the plaintiffs, will be able to access any walkway within the soft zone, will be able to speak freely, carry signs, and pass out pamphlets – even on the sidewalk on Causeway. The only limitations the City will impose will be those dictated by the physical capacity of the space itself. (Ex. A, Ex. D)

**D.      Discussions Between the City and the ACLU, NLG**

In October 2003, the City asked the ACLU and National Lawyers Guild (hereafter, "ACLU et al.") to participate in discussions about the potential First Amendment issues raised by Boston's hosting of the 2004 DNC. The City's interest in reaching out to these groups was based, in part, on the fact that they had prior experience with national conventions and presumably would be in the best position to offer meaningful suggestions as to how the City could best address demonstrator concerns and anticipate challenges to its security plans. (Ex. A)

A series of meetings have been held since that time, and issues concerning permitting city-wide, searches, arrest procedures, state/federal charging decisions, use of force protocols and the like have been the subject of extensive, good-faith negotiations by both sides.

The issue of access to Causeway Street and the FleetCenter, and the placement of a demonstration area, has been openly discussed for many months. As long ago as March, 2004, the ACLU et al. strongly recommended that there needed to be a place located within the soft zone where a parade or march could terminate "in an area that would allow demonstrators First Amendment access to the convention delegates." (Ex. G, ACLU letter 3/15/2004). They suggested that a demonstration area "in the area at the intersection of Haverhill and Causeway Street" be created. (Ex. G) The City agreed,

7

and relocated the demonstration area to its present spot (from an area and the westerly section of the Bulfinch Triangle, between Valenti Way and North Washington). The present placement of the demonstration area was suggested by the ACLU et al., and accepted by the City. (Ex. A)

Likewise, the tight space availability and the inability of demonstrators to be heard by those inside the hard zone from Causeway has been a subject of discussion for many months. In this same letter, the ACLU et al. ask that the border of the hard zone be moved to allow the travel lanes of Causeway Street to lie within the soft zone, and objected to the opaque scrim "as it prevents any meaningful communication between those inside the hard zone and those on the outside." (Ex. G) The City refused to reposition the fence, as all travel lanes were required for the free flow of emergency equipment and vehicles inside the hard zone. (Ex. A, Ex. B) The City also refused to remove the opaque scrim from the fence. (Ex. A)

E.     **Discussions Regarding Parade and March Routes**

The City received numerous applications for marches originating at points outside the soft zone (such as the Boston Common, City Hall Plaza, Sam Adams Park at Faneuil Hall) and ending in the demonstration zone. (Ex. H, affidavit of Patricia Malone) Some groups sought to march on Causeway Street. The City refused to issue permits for organized marches to travel on the sidewalk on Causeway and instead, offered proposed routes that would culminate in the demonstration area via Canal Street. (Ex. H).

Plaintiff ANSWER Boston is the only named plaintiff who sought a permit for Causeway and was denied although there were other groups, not party to this suit, who similarly were denied access to Causeway and offered alternative routes. (Ex. H)

8

Plaintiff ANSWER sought a route that would travel from the Boston Common at Beacon and Charles, to Joy, Cambridge, Staniford, Causeway, Canal, and return via New Chardon, Congress, Court, Tremont, Park, and Beacon. (Kirschbaum Aff. and attachments). The City issued a proposed route that travels from Beacon to Bowdoin, New Chardon, Merrimac, Portland, Valenti Way, Canal, and returning on Canal, New Chardon, Congress, State, Court, Tremont, Boylston, Charles. (Id.)

Although the City of Boston Transportation Department regulations forbid permits for parades to issue in the downtown area during rush hour, the City agreed to waive this prohibition for the week of the DNC after groups complained that the prohibition would lessen their opportunity to reach after-work commuters, and would prevent them from demonstrating during "prime time" convention hours. Thus, at the request of the ACLU et al., a designated march route was devised that accommodates marches during the evening rush hour commute (despite the substantial traffic congestion anticipated in light of roadway closures). (Ex. H)

On Sunday, July 25, there are a total of 80 events scheduled and permitted, including 3 parades, approximately 38- 40 rallies, and 37 private events (including the welcoming celebration for the delegates and media) (Ex. A).

## ARGUMENT

A party seeking a preliminary injunction must show that it (1) has a substantial likelihood on success on the merits, (2) faces a significant potential for irreparable harm in the absence of immediate relief, (3) the issuance of an injunction will not impose more of a burden on the nonmovant than its absence will impose on the movant, and (4) that

the granting of the relief is in the public interest. *McGuire et al. v. Reilly, et al.,* 260 F.3d 36,42 (1st Cir. 2001).

The plaintiffs do not have a substantial likelihood of success on the merits of this claim, as the restrictions imposed by the City are justifiable time, place and manner restrictions acceptable under the First Amendment. The plaintiffs have no showing of irreparable harm, since the object of their request – access to adequate sound and sight of the delegates and media attending the DNC – is well provided by the permits and space already dedicated to that cause by the City. Issuance of the preliminary injunction would cause great harm to the defendants and their federal law enforcement counterparts, as it would necessitate last-minute deployment and security changes, on the eve of a major political convention that has been designated as a national security event.

Finally, the granting of relief is not in the public interest, as the substantial displacement of law enforcement cost and effort would be spent to obtain nothing that the plaintiffs do not enjoy individually, and would bring them no sight or sound access to any person attending the convention. The plaintiffs' delay in bringing this action before the court – which in part increases the risk to the defendants, if the action were to be granted – should also weigh against the plaintiffs' ability to succeed.

A.  **The City's denial of any permits to march on the Causeway Street sidewalk is an acceptable time, place and manner restriction under the First Amendment.**

The City may impose restrictions on the time, place or manner of protected speech, provided that those regulations are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for the communication of information. A law is narrowly tailored if it promotes a substantial

governmental interest and does so without burdening substantially more speech than is necessary to realize that goal. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed2d 661 (1989). See also *Clark v. Cmty. for Creative Non-Violence,* 468 U.S. 288, 2993, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). The "narrow tailoring" requirement does not mean that the City must choose the least-restrictive means of serving that interest, *Ward,* 109 S.Ct. at 2757-58, so long as the means chosen are not substantially broader than necessary to achieve that interest. *Id.,* 109 S.Ct. at 2758. See also *United States v. Albertini,* 472 UlSl 675, 689, 105 S.Ct. 2897, 2906-07, 86 L.Ed.2d 536 (1985) (the validity of a regulation does not turn on a judge's agreement with the responsible decision maker concerning the most appropriate method for promoting significant governmental interests).

First Amendment interests must be harmonized with the City's need to exercise its traditional police powers. *Hill v. Colorado,* 530 U.S. 703, 714-15 120 S.Ct. 2480, 147 l.Ed.2d 597 (2000). Those powers and responsibilities include the duty to secure public safety, assure the free flow of pedestrian traffic on the sidewalks and streets inside the soft zone, to provide emergency responses when necessary to do so, and to ensure the maintenance of "peace and good order." *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). See also *Cox v. Louisiana,* 379 U.S. 539, 554, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (municipalities have the right to "regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use…"). These interests are "precisely the sort of interests that justify some incidental burdening of First Amendment rights." *McGuire v. Reilly et al.,* 260 F.3d 36, 48 (1st Cir. 2001).

**1.     The restriction is content-neutral**

It is uncontested that the City's refusal to permit the Causeway Street sidewalk is content neutral – no group seeking a permit to march on Causeway Street was granted one. (Ex. H)

### 2. The restriction is narrowly tailored to address a substantial governmental interest: specifically, to prevent overcrowding (and the public safety concerns which flow there from) in an extremely limited space

As the restriction is content neutral, the court imposes an intermediate scrutiny standard: Under the intermediate scrutiny standard, a law is deemed constitutional if it is narrowly tailored to serve significant state interests while leaving open ample alternative channels of communication .... A law is narrowly tailored if it promotes a substantial governmental interest that would be less effectively achieved without the law and does so without burdening substantially more speech than is necessary to further this goal. *McGuire v. Reilly,* 260 F.3d 36, 48. (1st Cir.2001).

The City's decision to forego granting permits for organized marches to proceed on the Causeway Street sidewalk is rooted firmly in its duty to assure the safety of the people in the soft zone, including the demonstrators. The plaintiffs' claim that this space is a "giant sidewalk, " see plaintiff's memorandum at pg. 8, is simply untrue. The space at issue here is a four-block stretch of sidewalk, bounded on one side by the edge of buildings, most faced with plate glass windows, and on the other, by security fencing. The space is twenty feet wide, so that at most, five adults can comfortably walk abreast. [aff?] Although the City has removed trash bins, mailboxes and newspaper boxes to open up as much space as possible, the sidewalk is punctuated by fire hydrants and street lights, posing further restrictions on the public's ability to move freely in this area. The City's interest in regulating the numbers of people who fill this area to prevent

overcrowding, and to facilitate movement of emergency personnel in the event that such becomes necessary, is significant.

Plaintiffs' arguments that the City's concerns regarding the business establishments located on Causeway miss the mark. The City's interest is in preventing overcrowding – an issue that came to the fore when the City decided against requiring these establishments to close during the week of the convention. Since the City did not mandate closure, it has an obligation to ensure that the patrons of these establishments are able to move relatively unimpeded. The City must also take into account the maximum capacity of these establishments in determining the number of people the space on Causeway can absorb.

The City has an interest in ensuring that the sidewalk remains available for those members of the public who wish to patronize those establishments, and must consider the resources, including space needs, that would be necessary in the event that an incident mandated either movement of emergency vehicles into the area, or the evacuation of the area. The City reasonably made the determination that it was counter productive to issue permits for organized marches to enter into an area that could not absorb those numbers of people.

3. **The City has provided ample alternative methods for the plaintiffs to express their views.**

Plaintiffs claim that the Causeway sidewalk has a special meaning to them as it fronts the FleetCenter, and thus that the location is an essential element in their request for a permit. The plaintiffs also allege that by denying permitted access to Causeway Street, the City is closing a forum and is denying the plaintiffs the opportunity to reach their intended audience. These allegations are wholly without merit.

13

The significance of Causeway Street is that the convention is occurring at the FleetCenter. It has no symbolic significance in itself, unlike the South Boston neighborhood at issue in *Nationalist Movement v. City of Boston*, 12 F.Supp.2d 182 (D.Mass. 1998). In that case, Judge O'Toole held that the request of the white nationalists to march in a neighborhood that had experienced dramatic social tension during the busing crisis was so tied to the place of the march that relocating that event to City Hall, in downtown Boston, would destroy the substance of the group's message.

No such consideration is present here. Causeway Street bears no independent significance. The plaintiffs' interest – and one which the City fully supports – is in having sight and sound access to the delegates and the covering media who are attending the convention. See plaintiffs' brief at 11, n.3. Causeway Street does not provide sight and sound access to the delegates or the media – indeed, counsel currently representing the plaintiffs note as much in their correspondence to the City earlier this year. The fence is a visual barrier that prevents anyone from Causeway seeing into the hard zone, and prohibits anyone inside the hard zone from seeing out.

Further, the creation of a two-story "media village" in front of the FleetCenter all but assures that no audible, discernable language uttered on Causeway will be heard inside the hard zone[1]. Access to Causeway Street in no way provides the plaintiffs with access to the delegates or to the media inside the hard zone.

The City has provided the plaintiffs with a demonstration area that brings them into sight and sound of the delegates, and does so at the point that the delegates enter the

---

[1] Compare *Service Employee Int'l Union v. City of Los Angeles*, 114 F.Supp.2d 966, 972 (C.D.Cal.2000), where during the 2000 Democratic National Convention the court held that placement of demonstrators behind the "media village", which blocked the sight line to the Staples Center, made it unlikely that the delegates would see or hear the demonstrators.

14

hard zone. The demonstration area is more than an ample alternative forum to reach the target audience. It provides the plaintiffs with visual and audible access that is not possible on Causeway Street. Although plaintiffs' claim that their intent is to "come face to face with DNC officials, delegates and onlookers," plaintiffs' brief at 11, they do not have such an opportunity on Causeway Street because the hard zone is barricaded – but they do have exactly that in the demonstration area.

*Service Employees Int'l Union v. City of Los Angeles*, 114 F.Supp.2d 966(C.D.Cal.2000) is instructive. In this case, involving a dispute over placement of demonstrators during the 2000 Democratic National Convention in Los Angeles, the court ordered the repositioning of the demonstration area from its original placement (where the sight line to the convention hall was blocked by a "media village," such that "it is likely that the delegates will not be able to see or hear" the demonstrators) to a position near the entrance where "delegates enter and leave" the facility. *Id.*, 114 F.Supp.2d 976, at 973.

By establishing the demonstration area at Haverhill Street, adjacent to the bus terminal, the City has placed the demonstrators at a point where they can see the delegates as they enter and leave the hard zone. The City has not positioned the demonstrators so far from the delegates that "only those delegates with the sharpest eyesight and most acute hearing have any chance of getting the message," as the court found during the LA convention, *Service Employees Int'l Union* at 972. Rather, the demonstrators will be within feet of the delegates as they enter and leave the event.

The City has installed a stage and audio system, and has granted all permits requested for the use of this equipment. The demonstration area is a vastly superior space than the twenty foot, barricaded sidewalk they seek now.

### 4. The plaintiffs have been granted full access to major City locations and streets for the DNC week.

Plaintiffs' claim that they have been relegated to back alleys and side streets in the City, and that in so doing they have been denied the opportunity to reach their intended audience, see plaintiffs' brief at p. 11, is frivolous and should be disregarded.

Affiant Steve Kirschbaum has been granted permits to rally or march on every day of the DNC week. (Decl. Of Kirschbaum, attachments). He has been granted rally permits to occupy the parade grounds at Boston Common, the Congress Street side of Faneuil Hall, and City Hall Plaza – three of the most prominent spaces in the City.

Affiant Kirschbaum's allegation that the parade route proposed by the City "shunts the parade along side streets" likewise is not accurate. The parade route outlined by the City take his group from the Boston Commons to the demonstration area over the following streets: Beacon, Bowdoin, New Chardon, Merrimac, Portland, Valenti Way, Canal, and back to the Common by Valenti Way, Canal, New Chardon, Congress Street, Court Street, Tremont, Boylston, Charles Street to Beacon. The parade permit has the plaintiffs' group occupying virtually every major and arterial roadway in downtown Boston.

Plaintiffs' claim that access to the media is of fundamental importance to them. The media will, during DNC week, be present at the following locations: Faneuil Hall Marketplace, Sam Adams Park, Long Wharf, Boston Common, City Hall Plaza (Aff.

Malone, Event List). There will be no limit on the plaintiffs' ability to see and be seen by the media during the convention week.

### B. The Motion For A Preliminary Injunction Should Be Denied For Being Untimely

Exhibit G, correspondence from the ACLU et al., demonstrates that the issues currently being brought before the court have been the subject of discussion between the parties for months. For the plaintiffs to bring this action before the court now, in the days before the commencement of a major party political convention, is inappropriate – particularly when the issue of sight and sound access to demonstrators, the location of the demonstration area, and the denial of permits for organized marches on Causeway Street have been the subject of such frequent discussion.

The location of the demonstration area was decided upon after consultation with the ACLU et al., and indeed is located at the very spot they suggested. (Ex. G). For them to participate in a claim that the demonstration area is constitutionally infirm is disingenuous.

The unavailability of Causeway Street was communicated to plaintiff ANSWER "sometime between June 11 and June 24," and this denial was affirmed during a formal meeting at Boston Police Headquarters on June 24. (Aff. of Kirschbaum, at ¶ 9-11).

Plaintiffs' delay in bringing this action before the court, especially where the relief sought would necessitate last-minute changes to deployment and other security concerns, mandates that the court review this request for a preliminary injunction with disfavor.

## **CONCLUSION**

For the reasons stated herein, the defendants respectfully request that the plaintiffs' motion for a preliminary injunction be denied.

Respectfully submitted,
DEFENDANTS CITY OF BOSTON
ET AL.,
By their attorneys
Merita A. Hopkins, Corporation Counsel


__/s/ Mary Jo Harris_____
Mary Jo Harris, BBO # 561484
Legal Advisor
Boston Police Department
One Schroeder Plaza
Boston, MA 02120
(617) 343-4550
