## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COALITION TO PROTEST THE DEMOCRATIC NATIONAL CONVENTION, et al., | ) ) ) ) |
| Plaintiffs, | ) Civil Action No.  04-11608-DPW ) |
| v. | ) ) |
| THE CITY OF BOSTON, et al., | ) ) |
| Defendants. | ) |
| v. | ) ) |
| UNITED STATES OF AMERICA, | ) ) |
| Intervenor. | ) |

**THE UNITED STATES OF AMERICA'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF**

**PRELIMINARY STATEMENT**

The United States of America (the "United States" or "Government"), which has intervened in this action as a Defendant, respectfully submits this Memorandum of Law in opposition to plaintiffs' motion for injunctive relief.

Plaintiffs' motion should be denied because they cannot show a likelihood of prevailing on any challenge to the constitutionality of the Security Plan for the 2004 Democratic National Convention ("Convention" or "DNC"), to be held in Boston from July 26, 2004, to July 30, 2004.  The Security Plan places a reasonable, content-neutral restriction on expressive activity by establishing a secure perimeter in the area

immediately surrounding the Fleet Center during the Convention. This secure perimeter is narrowly tailored to serve the significant government interest of ensuring security and protecting the safety of various attendees at the Convention, including Presidential and Vice Presidential candidates, former Presidents of the United States, numerous high-ranking domestic officials, various other protectees, Convention delegates, and their guests. Moreover, there will exist ample alternative channels of communication for those wishing to express their views, including a demonstration zone, provided by the City of Boston, that provides sight and sound access to the delegates along Haverhill Street. For all of these reasons, the United States respectfully requests that the Court deny plaintiffs' motion for injunctive relieve in its entirety.[1] In the alternative, in the event the Court is inclined to grant some form of relief, the United States requests that any such relief not require any alteration of the secure or "hard" zone of the Security Plan.

---

[1] The government also notes that some of the plaintiffs may lack standing to bring the instant suit, in that the permit applications at issue were filed by only a small number of organizations. The doctrine of standing, like the ripeness doctrine, is grounded in "the Art. III notion that federal courts may exercise power only 'in the last resort, and as a necessity,' and only when adjudication is 'consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process.'" Allen v. Wright, 468 U.S. 737, 752 (1984) (quoting Chicago & Grand Trunk R. Co. v. Wellman, 143 U.S. 339, 345 (1892), and Flast v. Cohen, 392 U.S. 83, 97 (1968)). To establish the "irreducible constitutional minimum of standing," a plaintiff must allege: (1) "an 'injury in fact' – an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of" such that the injury is "fairly traceable" to the defendant; and (3) a likelihood that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations omitted); accord, e.g., Wyoming Outdoor Council, 165 F.3d at 48. In this case, to the extent that any of the plaintiffs were not involved in the permitting process, they lack standing. The Government reserves its right to further develop and advance the standing argument when time and sufficient information permit.

# BACKGROUND

The 2004 Democratic National Convention will occur in Boston, from July 26, 2004 to July 30, 2004. The Convention activities will take place at the Fleet Center located generally along Causeway Street and over the commuter rail terminal known as North Station. Attendees at the Convention will include delegates representing 55 delegations and many prominent government officials including the Presidential and Vice Presidential candidates of the Democratic Party, members of Congress, state governors, various other protected persons, and their families. See Declaration of Special Agent Scott Sheafe, dated July 20, 2004 ("July 20 Sheafe Decl."), at ¶ 12.

Under 18 U.S.C. § 3056(e)(1), the United States Secret Service is authorized to participate in the planning, coordination, and implementation of security operations at special events of national significance, as determined by the President of the United States. The 2004 Democratic National Convention has been designated as a National Special Security Event, and the Secret Service has been designated as the lead federal agency in the design, planning, and implementation of security measures at such events. See July 20 Sheafe Decl. at ¶ 5.

The Boston Police Department ("BPD") and the United States Secret Service have developed a Security Plan for the 2004 Democratic National Convention (the "Security Plan") that provides for the establishment of a secure perimeter surrounding the Fleet Center, in effect from approximately 6:00 p.m. on Friday, July 23, 2004, to 12:00 p.m.,

Friday, July 30, 2004.  Id. at ¶ 9.  The boundaries of the secure perimeter are shown on Exhibit C to the Defendants' Memorandum of Law In Support of Their Opposition To the Plaintiffs' Request For a Preliminary Injunction (filed by the City of Boston).  Only individuals with credentials indicating that they are invited guests of the Democratic National Committee, along with law enforcement and public safety officials working in their official capacity, will be permitted to enter this secure area.  Id. at ¶ 9.  These individuals will be subject to search of their persons, possessions, and vehicles.  Id. ¶ 10.

In determining the Security Plan, and specifically the need for the secure perimeter as well as its contours, the Secret Service considered numerous factors.  Among the myriad factors considered were: (1) the profile of the 2004 Democratic National Convention as a potential target for terrorists; (2) the distance necessary to minimize the effect of weapons, bombs, and other explosives and weapons; (3) the geography of the area surrounding Fleet Center and the amount of space necessary to secure the site, including the ability to ensure access by emergency vehicles; and (4) the reasonable expectations of demonstrations and the possibility of civil disobedience and disturbance.  See generally July 20 Sheafe Decl. and Second Declaration of Scott Sheafe (Second Sheafe Decl.).

The City of Boston has established an area where organized demonstrations can occur, and will equip this area with a stage and sound equipment.  Affidavit of Robert Dunford ("Dunford Aff.") ¶¶ 22-25.  The area is approximately 28,000 square feet and can hold approximately 4,000 people.  Persons using this demonstration area will have

sight and sound access to the delegates, who will arrive and disembark from their buses directly adjacent to the demonstration area. Id.

On July 20, 2004, the plaintiffs filed a Motion for a Preliminary Injunction, seeking to have this Court order the Defendants to approve the plaintiffs' proposed parade route on Causeway Street.[2]

---

[2] The plaintiffs have waited until the 11th hour to file their suit - just three days before the hard zone is to go into effect around the Fleet Center. In balancing the various interests in the case, the delay in filing suit should count against the plaintiffs. Indeed, in United for Peace & Justice v. City of New York, 243 F. Supp. 2d 19, 28 n. 12 (S.D.N.Y.), aff'd, 323 F.3d 175 (2d Cir. 2003) (per curiam), the court explicitly stated that plaintiffs' failure to give New York City more than three weeks notice of a proposed march was "but another reason to credit [the City's] concerns about this march."

## STANDARD OF REVIEW

A preliminary injunction is an "'extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (emphasis in original); Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982); Yakus v. United States, 321 U.S. 414 (1944) (a preliminary injunction is extraordinary relief of a drastic nature). The burden of proof in justifying an injunction is solely on the applicants; a defendant bears no burden to defeat the motion. Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 442-43 (1974).

In this Court "the criteria for the grant of a preliminary injunction are the familiar four: [1] likelihood of success [on the merits], [2] risk of irreparable harm, [3] the balance of equities and [4] the public interest." Pharmaceutical Research and Mfrs. of America v. Concannon, 249 F.3d 66, 72 (1st Cir. 2001) (quoting Langlois v. Abington Hous. Auth., 207 F.3d 43, 47 (1st Cir.2000) (citing Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir.1996); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991). Courts do not have to weigh these four factors equally. McGuire v. Reilly, 260 F.3d 36, 51 (1st Cir. 2001). Although "[l]ikelihood of success is the touchstone of the preliminary injunction inquiry," the other three factors "remain important." Vieques Conservation and Historical Trust v. Bush, 140 F.Supp.2d 127, 130 (D. P.R. 2001). Traditionally, a court exercises "'considerable discretion' in determining whether to grant a preliminary injunction" so long as its decision is "supported by adequate findings of fact and conclusions of law." I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir.

1998) (quoting <u>TEC Eng'g Corp. v. Budget Molders Supply, Inc.</u>, 82 F.3d 542, 544-45 (1st Cir. 1996)).

Where, as here, the Plaintiffs seek a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory authority, a critical inquiry should be focused on balancing of the equities and the effect on the public interest. See <u>Vieques</u>, 140 F.Supp.2d at 134; <u>No Spray Coalition v. City of New York</u>, 252 F.3d 148 (2d Cir. 2001).

## **ARGUMENT**

**I.    THE GOVERNMENT HAS A SIGNIFICANT INTEREST IN ENSURING SECURITY DURING THE 2004 DEMOCRATIC NATIONAL CONVENTION**

"[C]ourts have recognized that there are clearly specific security concerns associated with demonstrations on the City's streets and sidewalks in the vicinity of sensitive areas." <u>United for Peace & Justice v. City of New York</u>, 243 F.Supp.2d 19, 28 (S.D.N.Y.) (citing <u>Housing Works, Inc. v. Kerik</u>, 283 F. 3d 471 (2d Cir. 2002)), <u>aff'd</u>, 323 F.3d 175 (2d Cir. 2003) (per curiam). There can be no doubt that the Fleet Center during the 2004 Democratic National Convention will be a highly sensitive area. Indeed, the 2004 Democratic National Convention presents severely heightened and unique security concerns. See <u>generally</u> July 20 Sheafe Decl. and Second Sheafe Decl.

The 2004 Democratic National Convention is a high-profile event, which will receive substantial media coverage and is a time-honored event in the country's process for electing its president. Accordingly, it provides both a real and symbolic target for

persons or groups wishing to attack the American political process. See Second Sheafe Decl. ¶ 2. Indeed, just a few months ago, in March 2004, Madrid was the site of a deadly terrorist attack on the eve of Spain's national election. See Sheafe Decl. ¶ 2.

Attending the Democratic National Convention will be numerous high-level public officials, including Presidential and Vice Presidential candidates, former Presidents, their families, members of Congress, and other protected persons. "The fact that these high profile persons will attend the DNC makes it a more likely target for a host of extraordinary threats, which necessitate the implementation of a commensurate security plan. These concerns are vastly different than those attendant to the impromptu stop of a single protectee." Id. ¶ 12.

Another substantial factor is the post-9/11 security concerns. See July 20 Sheafe Decl. ¶ 12. As observed recently by the court in United For Peace and Justice, supra:

> The City's concerns with respect to crowd control are exacerbated by the added security concerns since September 11, 2001. The nation and the City are currently at the second highest security alert, a fact that the NYPD must take into account in determining the level of risk. The police can more effectively monitor crowds for terror threats at stationary rallies than they can crowds moving in a procession, which is the reason that the NYPD prefers a stationary rally in this case.

United for Peace & Justice, 243 F. Supp. 2d at 28.

The Security Plan must provide for a sufficiently large area to respond to emergency events. As stated by Scott Sheafe of the Secret Service:

> In particular, the secure perimeter must be large enough to
> permit rapid evacuation of the Fleet Center and adjoining

> structures in the event of fire, environmental hazard, structural safety issues, or chemical or biological or other terrorist attack. Open area must be reserved to provide a route to safely move evacuees away from the Fleet Center. In addition, space must be reserved to provide for access for emergency services, ambulance and fire truck access routes, and space for other emergency equipment and treatment areas. If an emergency event were to occur, the need for space for evacuation and the need for space for emergency vehicles would arise simultaneously.

July 20 Sheafe Decl. ¶ 13. And see Second Sheafe Decl. ¶¶ 6-7.

The Secret Service also must consider and prepare for the impact of firearms, bombs, explosives, and other weapons during the Convention. "Buffer zones created by the security perimeters from which unscreened individuals are excluded provide for increased security by diminishing the accuracy of firearms or thrown objects and by minimizing the effect of an explosive device on a target." July 20 Sheafe Decl. ¶ 14.

There is a distinct possibility of civil disturbance and disobedience. See Second Sheafe Decl. at ¶ 8. For example, the Black Tea Society, the plaintiffs in another case, Black Tea Society v. City of Boston, 04-11620-DPW, has publicly proclaimed on its website as follows:

> Those of us in Boston, who are ignored by the mathematics of power, are preparing to resist the invasion of the DNC. For months now, we have been working feverishly to setup the logistics for this carnival of resistance. Based upon discussions during the consulta held in early February, we are proposing a three-pronged plan of action for the convergence.

<http://blackteasociety.org/calls/calls/calls/bazaar-dnc.html>. The Secret Service's reasonable expectation in civil disobedience and disorder is also grounded upon recent events, such as the 1999 World Trade Organization conference in Seattle, Washington, and the 2000 and 2002 International Monetary Fund meetings in Washington, D.C., as well as the 2000 DNC in Los Angeles. Id.

Respectfully, this event is *not* the equivalent to a routine sports event held at the Fleet Center. The nature of the event, the attendees, and the people outside the event are all fundamentally different and give rise to much greater security concerns. See, e.g., Second Sheafe Decl. ¶ 2. Indeed, a national political convention itself is protected by the First Amendment. See Democratic Party v. LaFollette, 450 U.S. 107 (1981) (upholding under the First Amendment the right of Democratic National Party to select convention delegates according to the party's own rules).

For all of these reasons, the Government has shown that it has more than a significant interest at stake, not only in the security to be provided for the DNC, but also in maintaining the currently designated secure perimeter.

II.   **THE SECURITY PLAN FOR THE 2004 DEMOCRATIC NATIONAL CONVENTION PLACES A MINIMAL CONTENT-NEUTRAL RESTRICTION ON EXPRESSION THAT IS NARROWLY TAILORED TO ACHIEVE A SIGNIFICANT GOVERNMENTAL INTEREST**

   A.   **The Constitutional Standard for a Valid Time, Place, or Manner Restriction on Expression**

The right to use public streets and sidewalks for assembly and communicating views is fundamental to the First Amendment. See Perry Educ. Ass'n v. Perry Local

Educators' Ass'n, 460 U.S. 37, 45 (1983). It also is beyond cavil, however, that "[t]he privilege of a citizen of the United States to use the streets . . . for communication on views on national questions may be regulated in the interest of all." Hague v. CIO, 307 U.S. 496, 516 (1939); see City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804 (1984) ("It has been clear since the Court's earliest decisions concerning the freedom of speech that the state may sometimes curtail speech when necessary to advance a significant and legitimate state interest."); United for Peace & Justice, 323 F.3d at 176 ("[T]he right to use public forums such as streets for speech and assembly is not absolute."); see also Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 501 (1981) ("[A]t times First Amendment values must yield to other societal interests.").

  Where, as here, the Government imposes a content-neutral restriction on speech in a public forum, courts apply the traditional "time, place, or manner" test for constitutionality. "[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels for communication of the information.'" Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Cmty. For Creative Non-Violence, 468 U.S. 288, 293 (1984)); accord Virginia Pharm. Bd. v. Virginia Consumer Council, 425 U.S. 748, 771 (1976). The Security Plan survives this three-part "time,

place, or manner" test because it imposes a limited restriction on expression, which directly advances—indeed, is necessary for—the substantial governmental interest in maintaining security at the Democratic National Convention, while also establishing ample alternative communication channels.

### B. The Security Plan for the Convention Is Content-Neutral

The threshold inquiry for a valid "time, place, or manner" restriction is whether the restriction is "'based upon either the content or subject matter of speech.'" Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 648 (1981) (quoting Consol. Edison Co. v. Public Serv. Comm'n, 447 U.S. 530, 536 (1980)). This content-neutrality analysis ponders "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward, 491 U.S. at 791. Here there is no contention that the challenged features of the security plan are based upon content.

### C. The Security Plan Is Narrowly Tailored To Achieve the Significant Government Interest in Ensuring Security at the Convention

The second inquiry is whether the regulation is "narrowly tailored to serve a significant governmental interest." Cmty. for Creative Non-Violence, 468 U.S. at 293. This entails considering, first, whether the government's proffered interest is significant, and, second, whether the regulation is narrowly tailored to achieving that interest.

#### 1. The Government's Interests in the Security Plan Easily Ascend to the Level of Significant

There can be no serious dispute that the government interest in maintaining security at the Convention and ensuring the safety of the Presidential and Vice-

-11-

Presidential candidates and other government officials is, at a minimum, substantial. In these tumultuous and dangerous times, it is hard to fathom a greater government interest than security for these persons for such an important component of this nation's democratic process. See, e.g., Watts v. United States, 394 U.S. 705, 707 (1969).[3]

In addition, the Government also has a significant interest in protecting the safety of all Convention attendees as they enter and exit Fleet Center. In upholding a statute which prohibited any person from approaching within eight feet of another person at surrounding health care facilities, the Supreme Court recognized that there is a "substantial and legitimate" state interest in protecting people attempting to enter health care facilities from "unwanted encounters, confrontations, and even assaults." Hill v. Colorado, 530 U.S. 703, 729 (2000).

It is reasonable to expect attendees at the Convention, including the delegates, to be the target of confrontation, both verbal and perhaps physical, by certain demonstrators seeking to express their fury and provoke an altercation. The Government has an interest in protecting these attendees from "unwanted encounters, confrontations, and . . . assaults." Id.; see Heffron, 452 U.S. at 650 ("As a general matter, it is clear that a State's

---

[3] Indeed, the Supreme Court and other courts routinely have found vastly weaker governmental interests to be "significant" for purposes of a "time, place, or manner" analysis. See, e.g., Ward, 491 U.S. at 796 (finding "substantial interest in protecting . . . citizens from unwelcome noise" (quotation marks and citations omitted)); Cmty. for Creative Non-Violence, 468 U.S. at 296 (finding a "substantial interest in maintaining the parks . . . in an attractive and intact condition"); White House Vigil for ERA Comm., 746 F.2d 1518, 1528 (D.C. Cir. 1984) (finding government's aesthetic interest in preserving the public's unimpaired view of the White House to be substantial).

interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective."); see also Serv. Employee Int'l Union v. City of Los Angeles, 114 F.Supp.2d 966, 971 (C.D. Cal. 2000) ("a narrowly tailored no activity zone is constitutionally permissible in order to ensure that the delegates can enter and exit the Staples Center safely"). There are real and serious security concerns surrounding the 2004 Democratic National Convention which mandate that the secure zone not be altered. See July 20 Sheafe Decl. at ¶¶ 12–14; Second Sheafe Decl. ¶ 8.

### 2. The Security Plan Is Narrowly Tailored To Achieve These Significant Interests

The question then becomes whether the Security Plan is narrowly tailored to achieve these substantial governmental interests. The Supreme Court has made clear that the narrowly tailored inquiry does not mandate that the challenged conduct be the least intrusive means of achieving the governmental interest. Ward, 491 U.S. at 798 ("[A] regulation of time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interest but that it need not be the least restrictive or least intrusive means of doing so."). The Supreme Court's decisions "quite clearly hold that restrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech." Hill, 530 U.S. at 736 (internal citations and quotations omitted). The Court explained in Ward that "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be

invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." 491 U.S. at 800; accord Carew-Reid v. Metro. Transp. Auth., 903 F.2d 914, 917 (2d Cir. 1990) ("[I]f the scope of the regulation is not substantially border than required to secure the governmental interest, the regulation is not invalid simply because a court, second-guessing the decisions of the governmental body, discerns some less-restrictive alternative to the regulation.").

The secure perimeter surrounding Fleet Center is the least restrictive means of serving the Government's substantial security interests. The Secret Service has conducted analyses of the impact of explosives and other weapons at certain distances from Fleet Center and determined that the secure perimeter, with its current boundaries, is necessary based on those analyses. All remaining space on Causeway Street within the secure perimeter is needed to ensure access and operation of emergency and other equipment and possible evacuation of persons from the Fleet Center. It would be impossible to adequately secure safety during the Convention if the streets immediately surrounding the Fleet Center remained open. See Sheafe Declaration, ¶¶ 5, 6, 7. See United for Peace & Justice, 243 F.Supp.2d at 24 (concluding City's ban on a march in front of the United Nations was narrowly tailored to the City's legitimate security concerns because "this march is simply too large for the BPD to adequately secure the safety of the United Nations Headquarters"). At the same time, however, the area is no

larger than necessary to achieve the government interest in maintaining security at the Convention. See Second Sheafe Decl. ¶ 5.

For these reasons, the Security Plan at the 2004 Democratic National Convention is easily distinguishable from the proposed plan for the 2000 Democratic National Convention in Los Angeles, which was invalidated by the Central District of California in Service Employee International Union v. City of Los Angeles, 114 F.Supp.2d 966 (C.D. Cal. 2000). Initially, the restricted area surrounding Fleet Center will be significantly smaller than the proposed no activity zone surrounding the Staples Center. The court in Service Employees International Union explained that the proposed "secured zone" at the 2000 Democratic National Convention was approximately eight million square feet in size. See Serv. Employee Int'l Union, 114 F.Supp.2d at 968. In comparison, the secure perimeter at the Democratic National Convention encompasses an area of approximately 1,110,808 square feet. Second Sheafe Decl., ¶ 8. The small radius of the secure perimeter at the 2004 Convention indicates that any restriction on expressive activity has been narrowly tailored to achieve the governmental's substantial security.

In addition, it cannot be emphasized enough that the circumstances of the 2004 Democratic National Convention are vastly different from those of the 2000 Democratic National Convention. Any "narrowly-tailored" analysis necessarily is tied to the specific facts surrounding the challenged regulation. See Heffron, 452 U.S. at 650–51 ("[C]onsideration of a forum's special attributes is relevant to the constitutionality of a

regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved.").

Finally, in holding that the zone surrounding the 2000 Democratic Convention failed the narrowly tailored test, the Central District of California explained that the zone covered "much more area than necessary to serve" the governmental interest in protecting the safety of Convention delegates.  Serv. Employee Int'l Union, 114 F.Supp.2d at 971.  The correct test, however, asks whether the content-neutral regulation on speech is narrowly tailored to achieve a significant governmental interest and the regulation "need not be the least restrictive or least intrusive means of" serving the government's interest.  Ward, 491 U.S. at 798.

In sum, the Security Plan at the 2004 Democratic National Convention "directly further[s] the city's legitimate governmental interests . . . and . . . those interests would [be] less well served in the absence of the [regulation]."  Ward, 491 U.S. at 801.

### D. The Security Plan Provides for Ample Alternative Channels of Communication for Individuals Seeking To Demonstrate During the Convention

The final element of the "time, place, or manner" test is whether ample alternative channels for communication have been left open.  In devising the Security Plan, the Secret Service, the BPD, and Boston have gone to great lengths to ensure that various ample channels for expressive activity remain open during the Convention.

An "ample" alternative channel need not be an equivalent one.  This requirement does not mean that the plaintiffs must have "access to every or even the best channels or

locations for their expression." Carew-Reid, 903 F.2d at 919.  Nor does the ample alternative inquiry turn on whether the plaintiffs find the alternative to be as beneficial as the channel being proscribed; rather, an alternative channel will survive if plaintiffs receive sufficient opportunity to convey their views.  See Housing Works, Inc. v. Kerik, 283 F.3d 471, 481–82 (2d Cir. 2002);  Harm Reduction Coalition v. Bratton, No. 95 Civ. 3171 (LAP), 1995 WL 271766, at *2 (S.D.N.Y. May 9, 1995) ("The fact that plaintiffs are dissatisfied with the alternative route offered . . . does not make the restriction imposed unconstitutional."); Globe Newspaper Comp. v. Beacon Hill Architectural Commission, 100 F.3d 175, 188 (1st Cir. 1996) (access to the intended audience need only be sufficient, not the best nor most ideal, to convey their message).

The Second Circuit, in United for Peace and Justice v. City of New York, 323 F.3d 175 (2d Cir. 2003) (per curiam), recently applied the "ample alternative channels" inquiry.  There, the Second Circuit affirmed the denial of a preliminary injunction, which sought to bar the city from denying a permit to a group seeking to protest the war with Iraq by marching in front of the United Nations building.  As an alternative to the requested march, the City permitted the group to hold a stationary rally (they wanted to march) at a location in close proximity to the United Nations.  Concluding that this alternative channel of expression was sufficient, the Second Circuit explained,

> We agree with the District Court that nothing in the
> record compels the NYPD to allow UPJ to march
> elsewhere in the City absent specific information
> regarding the logistics and organization of such march,
> and in light of the narrow time frame between the

> application and the protested march. In these circumstances, the option presented by the NYPD—namely a stationary rally in close proximity to the United Nations—is an appropriate, narrowly-tailored, time, place and manner restriction that provides the [plaintiff] ample opportunity to express its views.

Id. at 177.

The Security Plan provides for a demonstration zone having direct sight and sound access to Convention delegates. Additionally, other areas are available within the so-called "soft zone." See United for Peace & Justice, 243 F. Supp. 2d at 30 (finding City's alternative of a stationary demonstration ample where, inter alia, "the City's proposal d[id] not limit the number of participants who may attend the event"). Because the alternative channels are ample, any challenge to the constitutionality of the secure perimeter must fail.

## CONCLUSION

For the reasons stated above, the United States of America respectfully requests that the Court deny plaintiff's motion for injunctive relief, and even if it does intend to grant some relief, to not grant any relief that would impinge on the secure perimeter.

Dated:      July 22, 2004

        Respectfully submitted,

        Michael J. Sullivan
        United States Attorney for the
        District of Massachusetts
        Attorney for United States of America


By:   /s/ Anton P. Giedt
        Jennifer C. Boal
        George B. Henderson
        Anton P. Giedt
        Assistant United States Attorneys
        Tel.: (617)748-3100

---

**CERTIFICATE OF SERVICE**

Suffolk, ss.                                                                                                     Boston,
                      Massachusetts
                                                                                                                           DATE: July 22, 2004

I, Anton P. Giedt, Assistant U.S. Attorney, do hereby certify that I have this day served a copy of the foregoing upon Plaintiffs' and other counsel of record by first class mail and hand delivery.

                                                                                 Anton P. Giedt
                                                                                  Assistant U.S. Attorney