UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
-----------------------------------)
COALITION TO PROTEST THE           )
DEMOCRATIC NATIONAL CONVENTION,    )
et al.,                            )
     Plaintiffs,                   )
                                   )
          v.                       )    CIVIL ACTION NO.
                                   )    04-11608-DPW
CITY OF BOSTON,                    )
et al.,                            )
     Defendants; and               )
                                   )
UNITED STATES OF AMERICA,          )
     Defendant Intervenor.         )
-----------------------------------)

-----------------------------------)
BL(A)CK TEA SOCIETY,               )
et al.,                            )
     Plaintiffs,                   )
                                   )
          v.                       )    CIVIL ACTION NO.
                                   )    04-11620-DPW
CITY OF BOSTON,                    )
et al.,                            )
     Defendants.                   )
-----------------------------------)
```

MEMORANDUM
REGARDING MOTIONS FOR PRELIMINARY INJUNCTIONS
July 23, 2004


These two related cases put into focus two potential

flashpoints along the interface between the highly restricted

area designated for conduct of the upcoming Democratic National

Convention ("DNC") and the more accessible area surrounding it.

The DNC is scheduled to open formally next week at Boston's

FleetCenter, in a geographically and structurally constrained setting, to nominate Presidential and Vice Presidential candidates and to adopt a party platform.  The process of securing the area for conducting the DNC will begin this evening. The DNC will be the first national political convention to be held following the September 11, 2001 terrorist attacks on New York's World Trade Center that were launched from Boston's Logan Airport.  It has been designated by the President as a National Special Security Event, and, in light of recent experience with such events, the Secret Service and the Boston Police Department have developed extraordinarily stringent security measures in connection with it.

Plaintiffs in these cases, filed earlier this week, are loose coalitions of political activists who oppose various elements of the Democratic Party's official agenda, and wish to protest against the DNC.  They respectively challenge (1) the denial of permits for parade routes immediately next to the outer security perimeter of the FleetCenter, and (2) the demonstration zone being constructed to permit protesters to be adjacent to the transportation node through which the vast majority of delegates and invited guests to the DNC must pass in order to enter the FleetCenter.

Plaintiffs in the first action, No. 04-11608 ("the Coalition action"), seek to conduct parades -- on Sunday, July 25, the day

-2-

before the DNC opens, and on each of the following four days of
the convention -- along Causeway Street, the public way abutting
the FleetCenter.  The City issued parade permits, but refused to
allow the parades to proceed along Causeway Street.  The permits
directed the parades along Valenti Way, a street one block south
of Causeway Street.  The revised parade routes would also afford
participants in the parades the opportunity to progress into a
fenced-in designated demonstration zone ("DZ").  The Coalition
does not wish to enter the DZ at all.  In any event, it
challenges the City's refusal to allow parades on Causeway Street
as violating the First Amendment.

Plaintiffs in the second action, No. 04-11620 ("the Bl(a)ck
Tea action"), were prepared to use the DZ, and Bl(a)ck Tea
plaintiffs applied for, and received, permits to do so.  They
would use the DZ if it were to be redesigned and reconstructed,
but challenge the precise manner in which the DZ is now being
constructed, and the rules that will apply therein and nearby, as
violating the First Amendment.

In expedited proceedings conducted earlier this week, both
sets of plaintiffs moved for preliminary injunctions.[1]  In an

---

[1] I note that there are some potential questions concerning
precisely which plaintiffs are proper in each action.  In the
Coalition action, it appears that only plaintiffs ANSWER Boston
and USWA Local 8751 have standing, because only they applied for
(and were denied) permission to parade along Causeway Street.  In
the Bl(a)ck Tea action, it is possible that all plaintiffs have
standing; several of these plaintiffs seek to represent a class.

oral ruling from the bench yesterday, I concluded that the
Coalition plaintiffs had demonstrated a likelihood of success on
the merits of their claim that prohibition of their parade route
along Causeway Street on Sunday would violate the First
Amendment, and granted the requested preliminary injunction
limited to the Sunday parade only.  By contrast, because of the
limited range of options reasonably available, I denied the
Bl(a)ck Tea plaintiffs the preliminary injunctive relief they
requested.  The oral rulings were designed to expedite resolution
of the injunctive requests and facilitate prompt assertion of
appellate rights for any party that chose to do so.  This
Memorandum is designed to provide an expanded written explanation
for my rulings.

## I.  BACKGROUND

### A.  Facts

I find the following facts based on the submissions of the
parties, including affidavits, maps, documents, and the proffers
made during expedited hearings over the past two days.
Importantly, this information was supplemented by a view of the
relevant area that I conducted on Wednesday, accompanied by
counsel for the parties; the officials with operational

---

In any event, there is no present dispute that there is at least
one plaintiff in each action capable of raising all the relevant
claims for the purposes of the motions for preliminary
injunctions.  There is consequently no occasion to make more
detailed standing determinations at this stage.

responsibility for the security arrangements, Superintendent
Robert Dunford of the Boston Police Department ("BPD") and
Special Agent Scott Sheafe of the United States Secret Service;
and a number of the individual plaintiffs in the cases.

    1.   <u>The Larger Security Environment</u>

Security arrangements for the DNC have radiated out from the
"hard security zone," which comprises the FleetCenter and the
immediately adjacent area.  The hard security zone is under the
jurisdiction of the United States Secret Service.  Only those
with official convention, press, VIP, staff, or other credentials
may enter, and to do so they must pass through a magnetometer
into the hard zone, where they are subject to search.

Extraordinary measures -- which are not at issue in these
cases -- are being taken to secure the areas west, north, and
east of the FleetCenter.

The Thomas P. O'Neill Federal Building, next to the
FleetCenter on the west, will be closed to the public for the
duration of the DNC.

North Station, the principal railway terminal for travel
between Boston and points north and west, and part of which is an
element of the FleetCenter itself, will also be closed beginning
this evening at about 8:00 PM.  This closure -- like those of the
portion of the Charles River north of the FleetCenter, and nearby
public transportation -- will continue for the entire time period

of the DNC.

Each day that the DNC is in formal session, beginning several hours before the start of proceedings and continuing until several hours after their conclusion, Interstate 93 (which passes just to the east of the FleetCenter) will be closed. Interstate 93 is the major roadway to points well north and south of the City of Boston itself, and the closure will require a massive reordering of traffic patterns in the metropolitan area.

The "soft security zone," lying roughly south of the hard zone surrounding the FleetCenter, is the general area of the dispute in this litigation.  The soft zone is approximately coincident with the area known as the Bulfinch Triangle, which is bounded by Merrimac Street along the southwest, New Chardon Street along the south, Washington Street along the east, and Causeway Street along the north.

Causeway Street is thus the southern dividing line between the hard zone and the soft zone.  Beginning this evening, only 20 feet of sidewalk along the south side of Causeway Street will be in the soft zone.  An opaque fence will be erected next to the sidewalk along the roadway to the north to mark the southern boundary of the hard zone.

The City retains final jurisdiction over the soft zone. Anyone may enter it; restaurants, bars, and stores will be open. Anywhere in the soft zone, leafleting and small stationary

demonstrations of 20 persons or less may be conducted without a permit. Demonstrations of between 21 and 50 people require a permit; the City has committed to processing such permit applications within two days. The principal restrictions in the soft zone are that (1) no vehicles will be allowed other than for public safety personnel, and (2) no tables or chairs will be allowed to be brought in.

No random security checks will be conducted on pedestrians entering or using the soft zone, and they will be permitted to carry bags and backpacks while there. However, if the BPD determines that the streets of the soft zone have reached their maximum capacity -- approximately 2,000 persons for Causeway Street, and 12,000 persons for all the side streets combined -- then it will temporarily restrict entry until a sufficient number of people have left so as to make room for new arrivals.

    2.   <u>The Specific Locations at Issue</u>

       a. <u>Causeway Street</u>

Without the hard zone security fence running through it, Causeway Street is ordinarily four lanes wide at its eastern end. At the western end -- in front of the Thomas P. O'Neill Federal Building, and just west of the intersection of Portland Street -- it narrows to three lanes. Elevated MBTA (Green Line) tracks, which will not be used for transportation during the DNC, are overhead, providing a sort of roof over the surface area of

-7-

approximately the southern three lanes of the road.

In early planning, the BPD intended to cede all of Causeway Street to the hard zone. However, after complaints from various sources, including businesses on Causeway Street, the City made certain adjustments. It built out the sidewalk on the south side of Causeway Street to a total width of approximately 20 feet. The southern portion of the Causeway Street corridor -- the expanded southern sidewalk, and the businesses that front it -- were left within the soft zone. Various street furniture -- stanchions, bollards, streetlights, and the like -- continue, however, to punctuate and obstruct this expanded sidewalk.

To mark the hard zone at the northern edge of the expanded sidewalk, the Secret Service will install an eight foot fence, covered with a wire mesh designed to withstand assault by persons who might attempt to breach it. The fence will be lined with an opaque fabric scrim, specifically designed to prevent visibility. The purpose of this scrim, according to the BPD, is "to protect the delegates and other attendees, and to prevent hostile viewers from determining the strength and positioning of [] law enforcement assets." Emergency and other public safety equipment will be able to use the roadway in the hard zone behind the fence, which is designed to provide, if necessary, for simultaneous operation of emergency vehicles and emergency evacuation.

Thus, the extended sidewalk on Causeway Street's southern (soft zone) side will be bounded on the north by an opaque and imposing fence and on the south by the walls and plate glass windows of the ordinary structures (restaurants, bars, etc.) that line the street's south side.  On the expanded Causeway Street sidewalk, as elsewhere in the soft zone, the City will permit pedestrians movement and small or spontaneous demonstrations. However, the City has stated its intent to deny all applications for parade permits.

### b. Designated demonstration zone

The "designated demonstration zone" is located in the soft zone just south of the corner of Haverhill Street and Causeway Street.  The DZ is a roughly rectangular space of approximately 26,000 to 28,000 square feet -- very approximately 300 feet by 90 feet.  The long direction runs north-south along Haverhill Street, and the eastern edge faces the outdoor parking lot that will be used as a bus terminal for arriving and departing DNC delegates.

A written description cannot begin to convey the ambience of the DZ site as experienced during the view.  Most -- at least two-thirds -- of the DZ lies under unused Green Line tracks.  The tracks create a space redolent of the sensibility conveyed in Piranesi's etchings published as Fanciful Images of Prisons.  It is a grim, mean, and oppressive space whose ominous roof is

supported by a forest of girders that obstruct sight lines throughout as the tracks slope downwards towards the southern end.

At the northern end, inboard of the girders, there is a small stage wrapping around an unused MBTA building.  The City is providing a sound system and will allocate access to the stage itself through a permitting system.

Directly underneath the tracks, the clearance is generally the height of an adult.  However, at the edges of the tracks, including on the eastern side abutting the line parallel to the stage, diagonal girders slope at approximately sixty degree angles to the ground.  At their highest point these girders are above six feet, but for most of their distance they are well below it.  Thus, in practice, the area under the tracks is quite restricted by the girders.  During the view, I observed that a person of normal height could not carry a sign underneath the girders without lowering it to head level or lower.  If that were done, no one on the other side of the girders would be able to see it once it was raised again beneath the tracks.

As a consequence, the only feasible space for demonstrations within the DZ is between a line parallel to the back of the stage and the fence marking the eastern edge next to the bus terminal. Although the City calculated that some 4,000 persons could be accommodated in the entire DZ, this effectively useable area can

-10-

accommodate approximately 1,500 persons.  Moreover, as a result
of questions raised by my questions during the view concerning
the safety of egress, the City concedes that it must limit the
capacity of the DZ to no more than 1,000 persons.

The DZ is surrounded by two rows of concrete jersey
barriers.  Atop each of the jersey barriers is an eight foot high
chain link fence.  A tightly woven mesh fabric, designed to
prevent liquids and objects from being thrown through the fence,
covers the outer fence, limiting but not eliminating visibility.
From the top of the outer fence to the train tracks overhead, at
an angle of approximately forty-five degrees to horizontal, is a
looser mesh netting, designed to prevent objects from being
thrown at the delegates.

On the overhead Green Line tracks themselves is looped razor
wire, designed to prevent persons from climbing onto the tracks
where armed police and National Guardsman will be located.  The
use of razor wire and armed personnel in this way is not unique
to the DZ; it represents a more general use of the elevated Green
Line structure for a security vantage, beginning at the DZ and
continuing on the Green Line tracks along Causeway Street and
Martha Road, to oversee the southern and western boundaries of
the hard security zone.

c. Bus terminal

The bus terminal is designed to accommodate buses for DNC

-11-

attendees in two parallel rows.  Buses in the western row, the
only part of the bus terminal effectively within sight and sound
of the DZ, will park along a yellow line that runs at an angle to
the eastern edge of the DZ.  The line creates a funnel between
the DZ and the bus that is 39 feet at its northernmost and
narrowest point and then widens as it moves to the south.  The
line was drawn at this angle because of the constraints of the
bus terminal site, principally in order to permit safe and
efficient queuing for reboarding of buses when an expected 14,000
persons simultaneously emerge from the hard zone after the
conclusion of the formal DNC sessions each day.  This queuing
area must also accommodate a fixed and preexisting MBTA headhouse
tunnel ventilation structure.

     Delegates and invited guests will also, of course, pass
through this queuing area between the buses and the DZ wall after
disembarking, when they will proceed to the northern end of the
bus terminal, and then be processed through a 29 machine
"magnetometer village" on Causeway Street and into the hard zone.

     Delegates and invited guests arriving or departing via buses
on the opposite or eastern bus row of the terminal will have
essentially no visibility from or to the DZ because of the
distance and the mesh screen.  By contrast, those arriving or
departing via buses in the western row may be able to hear and,
to some extent, see demonstrators in the DZ, depending on

-12-

precisely which bus they take and whether they walk in relative
proximity to the DZ fence.  It will be, however, completely
impossible to pass a leaflet from the DZ to a delegate or other
DNC guest, even one who wants to approach the edge of the DZ to
receive the literature.

**B.    Procedural History**

    1.    <u>The Coalition action</u>

    On June 11, 2004 two persons -- members of plaintiffs ANSWER
Boston and USWA Local 8751 -- submitted a set of applications to
the City for permission to conduct five daily parades, including
one on Sunday, July 25 beginning at 2:00 PM, and thereafter on
each day from Monday, July 26 through Thursday, July 29 beginning
between 6:00-7:00 PM, just before the DNC will convene.  The
applications included proposed parade routes passing along
Causeway Street.  On July 7, 2004, after denying the applicants
permission to march on Causeway Street, the City provided an
alternate route by which the parades would proceed along Rip
Valenti Way, a quieter street one long block to the south of, and
parallel to, Causeway Street.  After various unsuccessful
negotiations, plaintiffs filed a complaint and motion for
preliminary injunction last Monday, July 19.

    2.    <u>The Bl(a)ck Tea action</u>

    As a result of early discussions with interested parties,
including the American Civil Liberties Union and National Lawyers

Guild, which represent the plaintiffs in these actions, the City undertook to provide a designated demonstration zone within sight and sound of the DNC delegates.  On March 15, 2004 the ACLU and NLG (including several counsel in this case) expressed displeasure with the site that the City initially proposed, and instead requested that "[t]he area which has been set aside for the delegates' buses should be modified or relocated to allow placement of the 'demonstration area' in the area at the intersection of Haverhill and Causeway Streets."

The City complied with this request, and furthermore undertook to make available a stage and sound system.  Various parties, including some plaintiffs, applied for and received permits to conduct rallies in the DZ.

The DZ was built out on or about Monday, July 19; before then it had been covered by debris and construction material. After viewing its construction, the Bl(a)ck Tea plaintiffs filed both a complaint and a motion for preliminary injunction last Wednesday, July 21.

## II.  LEGAL PRINCIPLES

### A.  Standard of Review

A district court presented with a motion for a preliminary injunction must consider "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the

hardship to the nonmovant if enjoined as contrasted with the
hardship to the movant if no injunction issues; and (4) the
effect (if any) of the court's ruling on the public interest."
Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151,
162 (1st Cir. 2004).  "Likelihood of success is the main bearing
wall of the four-factor framework."  Ross-Simons of Warwick, Inc.
v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996).  The greater
the likelihood of success on the merits, the less risk of
irreparable harm to the plaintiff must be shown.  Id. at 19.

   The court has "wide discretion in making judgments regarding
the appropriateness vel non of preliminary injunctive relief."
Charlesbank Equity Fund II, 370 F.3d at 162.  In the First
Amendment context, even if relief is to be granted, the court
"cannot simply order whatever a City is physically capable of
doing, without regard to considerations of public health, safety,
convenience, and cost," but rather "must make a sound exercise of
equitable discretion that considers all the relevant
circumstances.  The invalidity of a permit regulation cannot
automatically entitle a plaintiff to hold its event precisely as
it wishes."  Million Youth March v. Safir, 155 F.3d 124, 126 (2d
Cir. 1998) (modifying injunction).

**B.    General First Amendment Principles**

   The parties essentially agree on the basic principles of
law.  I will set forth the generally-agreed principles, and then

apply those principles to the facts of this case where the real disputes reside.

The First Amendment to the United States Constitution proscribes abridgement of "the freedom of speech . . . or the right of people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. Protest speech falls squarely within the protection of the First Amendment's guarantees of freedom of speech and assembly. See Shuttlesworth v. City of Birmingham, 394 U.S. 147, 152 (1969) (describing privilege of citizens to assemble, parade, and discuss public questions in streets and parks). However, it is well-settled that the First Amendment does not guarantee unlimited access to government property for expressive purposes. Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678 (1992) (government "need not permit all forms of speech on property that it owns and controls"). Whether restrictions on access to public property impermissibly infringe on free speech rights depends largely on the character of the property at issue. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44 (1983).

There is a "heavy presumption" against the validity of a prior restraint on speech. Forsyth County v. Nationalist Movement, 505 U.S. 123, 130 (1992). Notwithstanding this presumption, the government may impose permit requirements in

-16-

order to regulate competing uses of public fora.  Id.  A permit
scheme regulating the time, place, and manner of speech is
permissible, so long as it (1) does not "delegate overly broad
licensing discretion to a government official," (2) is content-
neutral, (3) is narrowly tailored to serve a significant
government interest, and (4) leaves open ample alternatives for
communication.  Id.; New Eng. Reg'l Council of Carpenters v.
Kinton, 284 F.3d 9, 20 (1st Cir. 2002).

     Because these requirements are framed conjunctively, all
four must be satisfied, and failure to satisfy even one renders
the permit scheme invalid.  The third and fourth criteria,
however, tend to be closely aligned.  Narrow tailoring means that
"the means chosen are not substantially broader than necessary to
achieve the government's interest."  Ward v. Rock Against Racism,
491 U.S. 781, 800 (1989).  However, "the regulation will not be
invalid simply because a court concludes that the government's
interest could be adequately served by some
less-speech-restrictive alternative."  Id.

### III.  ANALYSIS

**A.   The Causeway Street Parade Ban**

     1.   The Merits

     Causeway Street is a traditional public forum.  As a public
street, it is in the class of places that "'have immemorially
been held in trust for the use of the public, and, time out of

-17-

mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" Perry, 460 U.S. at 45 (quoting Haque v. CIO, 307 U.S. 496, 515 (1939)). Furthermore, because Causeway Street is the only street open to the public that fronts the FleetCenter, it is the symbolic "doorstep" of the DNC.

There is no argument here of excessive administrative discretion, so I turn to the other three criteria for evaluating the validity of permit schemes in a public forum.

### a. Content-neutrality

The restriction against parades in the soft zone applies to all parades, regardless of content, let alone viewpoint. While plaintiffs contend that the parade ban on Causeway Street will affect the content of their message, they do not contend that the restriction itself is content-based, and indeed I find that it is "justified without reference to the content of the regulated speech." Ward, 491 U.S. at 791. Consequently there is no meaningful argument that the second requirement is not satisfied.

### b. Narrow Tailoring

The narrow tailoring requirement is satisfied where the regulation promotes "a substantial government interest that would be achieved less effectively absent the regulation" but does not "burden substantially more speech than is necessary to further the government's legitimate interests." Id. at 799.

The regulation need not be the least restrictive means of serving the government interest; it must simply be "not substantially broader than necessary to achieve the government's interest." Id. at 800. In short, the "essence of narrow tailoring" is that the regulation must "focus[] on the source of the evils the [government] seeks to eliminate . . . and eliminate[] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." Id. at 800 n.7; Jews for Jesus v. Mass. Bay Transp. Auth., 984 F.2d 1319, 1323 (1st Cir. 1993) (relevant questions are "whether [the City's] interest is sufficiently substantial to justify the effect of the [restriction] on [plaintiffs'] expression, and whether that effect is no greater than necessary to accomplish the [City's] purpose").

The principal interest advanced by the City to justify the parade ban on Causeway Street is public safety. The soft zone portion of Causeway Street is indeed narrow, and because of the hard zone perimeter on the north side, access for law enforcement is limited. According to Chief Paul Burke of the Boston Fire Department, an engine company fire truck is approximately 28 feet wide and requires an additional 10-12 feet (i.e., 38-40 feet total) for the firefighters to maneuver properly; a ladder fire truck is approximately 40 feet wide and needs another 35 feet (i.e., 75 feet total).

This geometry has two implications.  First, the security planners had a real and significant interest in maintaining the maximum width possible on Causeway Street within the hard zone for emergency vehicle access and evacuation purposes, to protect the large crowds at the FleetCenter and elsewhere within the hard zone.  Second, the southern, soft zone portion of Causeway Street is effectively off-limits to emergency vehicles in any event, with or without a parade.

The fire department and other public safety agencies are concerned about their ability to direct movement within the soft zone should it become necessary to evacuate that zone due to the myriad threats that the BPD is preparing for, such as fire, bombing, or biological or chemical release.  Furthermore, because of the geography of the border between the soft zone and the rest of the city, any parade group attempting to enter Causeway Street would form bottlenecks, not only on the extended Causeway Street sidewalk, but also at the entrance to the soft zone.

Having considered these facts, and having conducted a detailed inspection of the site and thus observed facts that cannot be conveyed adequately in oral or paper submissions, I find that the complete ban on parades on the Causeway Street sidewalk from Monday through Thursday is narrowly tailored to significant interests in public safety.  The presence of delegates, media, people who work in or use the Bulfinch Triangle

for non-DNC purposes, and curious onlookers, combined with the
heightened risk of problems arising from the fact that the
convention itself will actually be in progress, will essentially
stress the public safety system to its limit.  Adding a parade
that obstructs the Causeway Street sidewalk, even a small one,
could easily overburden the system.  Cf. United for Peace &
Justice v. City of New York, 243 F. Supp. 2d 19, 24-25 (S.D.N.Y.
2003) (finding no First Amendment violation in prohibiting
100,000 person parade past United Nations, because police simply
could not provide adequate security for march), aff'd, 323 F.3d
175 (2d Cir. 2003) (per curiam).

On Sunday, however, no formal events will take place at the
FleetCenter, and the Bulfinch Triangle itself will be sparsely
populated due to the lack of businesses that would ordinarily
attract customers on a Sunday.  Indeed, according to an affidavit
submitted by plaintiffs, a survey of Causeway Street businesses
indicates that most will be closed on Sunday.  Thus, the
government's interest in public safety will be substantially
lessened on Sunday, or, put differently, the same ban that is
narrowly tailored Monday through Thursday is, on Sunday,
"substantially broader than necessary to achieve the government's
interest," Ward, 491 U.S. at 800.

On these facts, I find that the denial of plaintiffs' permit
to march on Causeway Street on Sunday "burden[s] substantially

-21-

more speech than is necessary to further the government's legitimate interests," <u>Ward</u>, 491 U.S. at 799.

       c. <u>Adequacy of alternatives</u>

The Coalition plaintiffs contend that an important part of their expressive message is that they are able to march to the "doorstep" of the DNC.

I note at the outset that the City has provided nuanced, reticulated options for many different types of expression within the soft zone and, of course, outside it. Inside it, plaintiffs may conduct small demonstrations with no permits whatsoever, and may conduct 21-50 person stationary demonstrations on an expedited permitting basis. Anyone may distribute leaflets, or hold signs.

Turning to Causeway Street itself, although the hard zone perimeter and the two-story "media village" interposed between it and the FleetCenter virtually guarantee that no DNC delegate will directly observe demonstrators on Causeway Street, there is expressive value in passing a particular destination even if no one is home. For instance, protesters often picket the White House when the President is out of town. Plaintiffs contend that the opportunity to march on the street that fronts the FleetCenter -- and, perhaps, to be photographed there by reporters -- has symbolic value not replaceable by a march down an alternate route one block to the south. It is well

-22-

established that the location of a demonstration may be "an essential part of the message sought to be conveyed," as well as "essential to communicating with the intended audience." Nationalist Movement v. City of Boston, 12 F. Supp. 2d 182, 192 (D. Mass. 1998); see also Schneider v. New Jersey, 308 U.S. 147, 163 (1939) ("one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place").

On these facts, the difference in practical effect between the approved route and the route plaintiffs seek may be modest. Certainly the Valenti Way route has some elements of adequacy. While plaintiffs want to march on Causeway Street, with one side against an essentially opaque wall, even though no delegates will be able to see or hear them, the City has authorized them to march on Valenti Way, which is more open than the expanded Causeway Street, and which will predictably provide some greater access to delegates or the media.  Valenti Way pierces and transverses the entire soft zone, and terminates about a block from the entrance to the bus terminal where the delegates will embark and disembark.  I recognize that Valenti Way is a long block south of Causeway Street.  During my site view, I observed that it feels more removed from Causeway Street, not to mention the FleetCenter, than a single city block.  In any event, while the practical differences between the contested parade routes may

be small, the _symbolic_ differences loom larger.  There is a
symbolic importance to marching right next to the site of the DNC
to bring to the attention of those who would listen the
protesters' concerns about the direction of the Democratic Party.
Even marching next to an opaque fence itself tells a story.  And
it is a story that the Coalition plaintiffs want to tell.

Causeway Street feels like the doorstep of the DNC, where an
organized group can convey its message, if not to those in power,
then through the fence that surrounds them.  Although I suggested
at one point during the hearing that Valenti Way might then be
viewed as the "stoop" to the DNC, I am satisfied that it is
sufficiently attenuated from the FleetCenter that the symbolic
dimension to the Coalition plaintiffs' parade is substantially
dissipated by its use.

On the basis of the specific facts presented, I find that
Valenti Way and the other soft zone speech opportunities may not,
in themselves, be adequate alternatives to a march along Causeway
Street.  Furthermore, I find that denial of permission to march
along Causeway Street could irreparably harm plaintiffs.

2.  Balance of Hardships and the Public Interest

The use of Causeway Street is considerably more demanding
upon police resources than the use of Valenti Way.  However, on
Sunday, when the rest of the soft zone will be sparsely
populated, it places the least strain on the system.  On the

other hand, plaintiffs estimate a much smaller crowd during the weeknight parades, which would also reduce the pressure on the City.  However, the diminution in marchers on these later nights will be more than offset by the influx of delegates, media, ordinary users of the Bulfinch Triangle, and other protesters not participating in the parades.  I find that the balance of hardships and the public interest favor issuance of an injunction to allow a march along Causeway Street on Sunday, but no injunction to rework the permitted route for plaintiffs' proposed marches on Monday through Thursday.

**B.    Designated Demonstration Zone**

    1.    <u>The Law of Demonstration Zones</u>

The use of designated protest or demonstration zones is a relatively recent innovation; they have apparently become routine at large political events ever since the 1999 World Trade Organization meeting in Seattle.  There is not much case law concerning them, and the cases, like this one, tend to be extremely factbound.  Given this circumstance it is difficult to adduce abstract principles, and detailed comparisons are of limited value.  Nevertheless, brief discussion of three cases can serve as background for approaching this area of First Amendment law.

In <u>Service Employees International Union Local 660 v. City of Los Angeles</u>, 114 F. Supp. 2d 966 (C.D. Cal. 2000) ("<u>SEIU</u>"),

the court considered -- nearly a month in advance of the event --
proposed security restrictions surrounding the 2000 DNC in Los
Angeles.  The Los Angeles police, in conjunction with the Secret
Service and other agencies, created a "secured zone" occupying
some 8 million square feet -- almost eight times the size of the
"hard zone" in this case.  The secured zone included numerous
public streets.  About 260 yards from the entrance to the
convention facility, a small demonstration zone was set up.

    The SEIU court found that the proposed secured zone was not
narrowly tailored because it was excessively large.  The court
further found that the demonstration zone was not an adequate
alternative for speech, in part because, despite the city's claim
that there would be a sight line to the convention facility, the
"distance ensure[d] that only those delegates with the sharpest
eyesight and most acute hearing have any chance of getting the
message, that is, assuming that the 'sight line' is not blocked
during the convention," which itself was deemed "a questionable
assumption" because a 10,000 person "media village" would lie
directly between the demonstration zone and the convention center
entrance.  The court issued a preliminary injunction ordering the
defendants to reconfigure the secured area and the demonstration
zone.  See id. at 968-69, 971-73, 974-75.  It bears noting, as
Secret Service Special Agent Sheafe reports, that thereafter the
demonstrators at the 2000 DNC "used slingshots to launch numerous

projectiles over the security fences at delegates, the Staples
Center, and law enforcement office[r]s."  In response, the LA
Police "utilized rubber bullets to disperse the crowd."

    In <u>United for Peace & Justice v. City of New York</u>, 243 F.
Supp. 2d 19, 24-25 (S.D.N.Y. 2003), <u>aff'd</u>, 323 F.3d 175 (2d Cir.
2003) (per curiam), plaintiffs applied, three weeks in advance,
for a permit to authorize a somewhat <u>ad hoc</u> parade of up to
100,000 people, to march in front of the United Nations
headquarters in New York City.  The city refused to allow the
demonstrators to march in front of the UN, even though the road
where the march would take place was six lanes wide and there
would be almost 40 feet between the marchers and the outer fence
protecting the UN, because the police simply could not provide
adequate security for march.  However, the city did permit the
marchers to conduct a large stationary demonstration confined to
Dag Hammarskjold Plaza, where the applicants had intended to
begin the parade.

    The District Court upheld the denial of the parade permit,
noting that similar (or even larger) parades were sometimes
permitted in the city.  The court credited police statements that
those parades tended to be regular events where the applications
were submitted well in advance, with specific details about the
numbers of participants, opportunity for meetings between the
police and the organizers, detailed contacts between police and

the leaders of "formation blocks," proper spacing, and so forth.
In contrast, the proposed UPJ march was seen as last-minute and
rather disorganized, with widely varying estimates of the number
of participants, and no reliable contact information for the
various participating organizations.  The court found that the
restrictions were not substantially broader than necessary to
achieve the city's interests in public, participant, and officer
safety.  243 F. Supp. 2d at 20-31.

     The Second Circuit affirmed, noting that "short notice, lack
of detail, administrative convenience and costs are always
relevant considerations in the fact-specific inquiry required in
all cases of this sort, [but] these factors are not talismanic
justifications for the denial of parade permits.  Likewise,
simply offering an alternative of a stationary demonstration does
not end the analysis."  323 F.3d at 178.

     Finally, quite recently, in Stauber v. City of New York, No.
03-9162, 2004 WL 1593870 (S.D.N.Y. July 16, 2004), the court
considered, inter alia, a challenge to moving "pens" used by New
York City police in the context of the Republican National
Convention to be held from August 30 to September 2, 2004.  The
"pens" are "metal, interlocking barricades . . . in which
demonstrators were required [by police] to assemble" and from
which they would not be permitted to leave, even to go to the
bathroom.  Id. at *1-8.  The court considered detailed evidence

regarding use of these pens at prior events, found that the pens policy was not narrowly tailored and violated the First Amendment, and issued a preliminary injunction against "unreasonably restricting access to and participation in demonstrations through the use of pens."  Id. at *28-29, 33; but see Olivieri v. Ward, 801 F.2d 602, 607 (2d Cir. 1986) (observing, without the benefit of Stauber's extensive factual record concerning how such pens are actually used, that "a barricaded enclosure for demonstrators and counterdemonstrators . . . is a practical device used by the police to protect those actively exercising their rights from those who would prevent its exercise"), cert. denied, 480 U.S. 917 (1987).

        2.   The DNC Demonstration Zone

        The overall impression created by the DZ is that of an internment camp.  The City has chosen -- to be fair, at a location suggested by the ACLU and NLG, and under constraints posed by the geography -- a place that was recently a construction site, not just on the wrong side of the tracks but literally under them.  But it is the only available location providing a direct interface between demonstrators and the area where delegates will enter and leave the FleetCenter.

        Between the overhead tracks, which provide very low clearance in many parts, and the multiple layers of fencing, mesh, and netting, the DZ conveys the symbolic sense of a holding

pen where potentially dangerous persons are separated from
others.  Indeed, one cannot conceive of what other design
elements could be put into a space to create more of a symbolic
affront to the role of free expression.

The problem presented is that, given the constraints of
time, geography, and safety, I cannot say that the design itself
is not narrowly tailored in light of other opportunities for
communication available under the larger security plan.  After
reviewing the affidavits of various law enforcement personnel, I
am satisfied that past experience at comparable events, including
the 2000 DNC in Los Angeles, adequately supports each of the
security precautions at the DZ as reasonable.[2]

---

[2]I inquired of both the City and the United States whether
they had any specific intelligence concerning security threats
during the DNC.  The United States indicated that it did, and
would be willing to provide that information to me <u>ex parte</u> and
<u>in camera</u>, but was unwilling to provide the information in the
presence of plaintiffs' counsel, even with a protective order,
because of concern regarding the potential difficulties for law
enforcement and various investigations.  I met <u>ex parte</u> with
representatives of the United States, and received information
from them that is reflected in the court reporter's notes.
    At plaintiffs' request, I declined to consider the
information that I had received because plaintiffs were unable to
confront it.  I explicitly stated yesterday at the hearing, and
now repeat, that the information that I received <u>ex parte</u> played
no role whatsoever in my determination regarding the propriety of
the preliminary injunction that is asked for by the Bl(a)ck Tea
plaintiffs.  I should add, for purposes of completeness, that
nothing in the information received suggested that the
disposition of the Bl(a)ck Tea plaintiffs' motion was
improvident.  In any event, the stenographer's notes are being
kept under seal, and are available to prepare a transcript should
judicial officers seek to review them in connection with any
appeal.

The double fence is reasonable in light of past experience in which demonstrators have pushed over a single fence. A second fence may prevent this altogether, or at least give police officers more time to respond and protect the delegates. The liquid dispersion fabric is reasonable in light of past experience in which demonstrators have squirted liquids such as bleach or urine at delegates or police. The overhead netting is reasonable in light of past experience in which demonstrators have thrown objects over fences. The razor wire atop the Green Line tracks -- which was not a subject of plaintiffs' written prayer for relief, but only because it was not erected until after they filed their complaint -- is reasonable in light of the possibility of demonstrators climbing upon the tracks and using them as an access point to breach the hard zone perimeter, and/or rain objects on delegates, media, or law enforcement personnel from above.[3]

Many of these security measures were designed to minimize the necessity and likelihood of physical confrontation -- in essence, hand-to-hand combat -- between demonstrators and police. At the hearings, I extensively explored with counsel various potential minor modifications, such as extending the fence eastward into the bus terminal, or providing small openings or

---

[3]I also note that the razor wire covers the entire portion of elevated Green Line tracks in the hard and soft zones. In other words, it is not directed specifically at DZ demonstrators.

"chutes" into the liquid dispersion fabric mesh so that
demonstrators could pass literature through the double chain link
fences to those delegates who wished to receive it.  After
receiving further information from the transportation coordinator
for the DNC, and from the BPD, I am convinced that no meaningful
modifications would be consistent with delegate safety.

The bus terminal has little, if any, excess space available.
Partly due to the terminal's specific design goal of making sight
lines available between the DZ and the delegates at the western
row of bus berths, the area between the western bus berths and
the DZ will be almost entirely occupied by delegates walking to,
or queuing up to board, their buses.  The placement of
stanchions, ropes, and the unfortunately unmoveable headhouse
essentially guarantees that any eastward extension of the DZ
fence would create an unsafe condition in the terminal, in which
delegates would be pushed unsafely close to moving buses.
Similarly, the police reasonably objected to the construction of
chutes through the liquid dispersion fabric because they could be
used to fire solid or liquid projectiles -- the very evil the
mesh was designed to prevent -- or could be themselves
transformed into offensive objects.

In short, there is no way to "tweak" the DZ to improve
plaintiffs' free speech opportunities without increasing a safety
hazard.  To be fair, I credit the City's representation that it

believed that the Green Line -- which is under the MBTA's
control, not the City's -- would be torn down by this point.
Whether or not the other elements of the DZ, standing alone,
would violate the First Amendment in this context, it is clear
that part of the elevated structure would have to be torn down in
order to make the DZ more open, less cabined, and less
threatening.  But demolition of the Green Line tracks in less
than a week -- on property that the City does not control, and
which is owned by an entity not before me -- is not a realistic
option.

Let me be clear: the design of the DZ is an offense to the
spirit of the First Amendment.  It is a brutish and potentially
unsafe place for citizens who wish to exercise their First
Amendment rights.[4]  But, given the constraints present at the
location and the BPD's reasonable safety concerns, there is no
injunctive relief that I could fashion that would vindicate
plaintiffs' First Amendment rights without causing quite
significant harm to the City, the delegates, and the public

---

[4]At the view, I inquired whether the DZ was subject to the
Massachusetts Building Code, and if so, whether it complied.  The
City's Inspectional Services Department concluded that, if the DZ
were considered an enclosed structure -- as it arguably should
be, since it is enclosed by netting, fencing, and razor wire --
the exits would be insufficient.  The City agreed to erect a
third exit in the form of a fenced corridor extending from the
DZ's south end to North Washington Street.  However, a fourth
exit would be required if more than 1,000 people would be present
in the DZ.  Consequently, the City intends to limit occupancy of
the DZ to 1,000.

-33-

interest as broadly defined in the form of increased risk to
those attending the DNC and further strain on the overtaxed
manpower resources of public safety personnel.

**C.    Bl(a)ck Tea Plaintiffs' Requests**

I now turn to Bl(a)ck Tea's specific prayers for relief.

First, Bl(a)ck Tea requests an injunction prohibiting the
City from denying access to the soft zone without a "clearly
defined emergency."  The City has stated that no person will be
denied access to the soft zone unless it reaches its capacity of
some 15,000 persons total, which it finds extremely unlikely.
Furthermore, the police must have adequate flexibility to make
judgments on the street concerning any emergency or public safety
issues, and I cannot and should not fashion an injunction to
control that discretion.

Second, Bl(a)ck Tea requests an injunction ordering the City
to allow plaintiffs to engage in any lawful assemblies and
expressive activities on any portion of Causeway Street.  I am
satisfied that, apart from the limitations on marching that I
have addressed in the Coalition case, the City's plans for free
expression within the soft zone adequately protect free
expression, and that the restrictions applicable there, including
the prohibition on the use or introduction of tables and chairs,
do not violate the First Amendment.

Finally, I turn to Bl(a)ck Tea's various prayers for

modification to the DZ.  Bl(a)ck Tea requests an injunction
ordering alterations in the fencing and concrete jersey barriers
dividing the DZ from the bus terminal.  For reasons stated above,
moving the fencing and concrete barriers would substantially
disrupt and interfere with orderly and safe use of the bus
terminal if were to be moved.  Finally, Bl(a)ck Tea requests
removal of the overhead netting, the liquid dispersion fabric
mesh, and one of the rows of concrete jersey barriers from the DZ
perimeter.  But these elements are necessary for the integrity of
that security barrier as it has been constituted, although I have
considered (and ultimately rejected) alternative ways of
providing for the distribution of printed materials.

I find that -- whether or not there is a colorable claim of
a First Amendment violation with respect to these aspects of the
DZ -- the potential hardships to the City, which must protect
delegates at the bus terminal, and the public interest, which
includes the delegates' safety in addition to the demonstrators'
free speech, counsel against issuance of a preliminary
injunction.

Two aspects of the DZ situation make the circumstance
irretrievably sad.  First, the many who wish vigorously but
peacefully to express their dissent are inhibited in their
ability to reach their intended audience because recent
experience has shown that there is a reasonable likelihood that

an aggressive few will insist on expressing themselves through the use of violence.  We have come to a point where it may be anticipated, at this and similar national security events, that some significant portion of the demonstrators, among those who want the closest proximity to delegates or participants, consider assault, even battery, part of the arsenal of expression.  And as a consequence, those responsible for event safety must plan for violence.  In fact, the chance for confrontation with the security measures themselves is viewed by some as a further opportunity for expression.

The second aspect that makes the DZ situation irretrievably sad is the physical environment.  It is a very cramped space, but there are few (if any) other locations that provide an opportunity to get close to the delegates and their invitees. Because the City reasonably feared violence from some of the demonstrators, but believed itself obligated to provide some minimal sight and sound access to the delegates, it has chosen to coop them all inside a bleak enclosed pen.

Protesters, demonstrators, and dissidents outside a national political convention are not meddling interlopers who are an irritant to the smooth functioning of politics.  They are participants in our democratic life.  The Constitution commands the government to treat their peaceful expressions of dissent with the greatest respect -- respect equal to that of the invited

-36-

delegates.

In this case, the City of Boston -- faced with undeniable and very serious concerns about protecting delegates to the Democratic National Convention, and constrained by some rather unfortunate geographic and structural features -- has provided protesters with an inadequate space. Unfortunately, the City faces very real physical constraints and there is little time, and no practical means, available for significant modifications to the secured environment.

In short, the circumstance is a sad one, but not one which I am authorized to second guess on this record. The interface between the DZ and the hard zone entrance is a source of abrasion generating what is symbolically a festering boil. But the courts are not authorized to lance the boil. The remedy must rather be left to more conservative treatment of constant observation and review under strained and difficult circumstances by the responsible operational personnel. Consequently, I declined to issue the preliminary injunction requested in the Bl(a)ck Tea action.

### III.    CONCLUSION

For these reasons, I may afford the plaintiffs in these cases only so much of the injunctive relief requested as allows them to march next to the opaque wall in front of the FleetCenter on the day before the DNC formally begins.


/s/Douglas P. Woodlock

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE